(No. 14819.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOE MANDRELL *et al.* Plaintiffs in Error.

*Opinion filed February 21, 1923.*

1. CRIMINAL LAW—*when evidence of other robberies is admissible to identify defendant.* In a prosecution for robbery with revolvers, where the defendants attempt to prove an alibi, evidence of other hold-ups at the same place and within thirty minutes of the time the prosecuting witness was robbed, including testimony as to the language used by the robbers in all the hold-ups and the manner in which they committed the robberies, is admissible as tending to identify the accused and to meet the defense of an alibi.

2. SAME—*objections to leading questions should be specific.* In order to give counsel an opportunity to re-state leading questions in a proper form, objections to such questions, if based on that ground, should state that the questions are leading, and if a general objection is sustained by the court because the question is leading the court should state the ground for its ruling.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. C. H. MILLER, Judge, presiding.

R. E. SMITH, and J. A. LOGAN, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROY C. MARTIN, State's Attorney, and GEORGE C. DIXON, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiffs in error, Joe Mandrell and Willie Marvel, were indicted and tried jointly in the circuit court of Franklin county for the robbery of Edward Tiberend, with revolvers. They were found guilty as charged in the indictment and their ages were found to be twenty-five and twenty years, respectively. Mandrell was sentenced to the penitentiary and Marvel to the reformatory, for indeterminate terms.

The evidence produced by the State is as follows: A few minutes before five o'clock in the evening of January 14, 1922, while returning from his work in a coal mine at Buckner, about four miles west of Benton, in Franklin county, the prosecuting witness was robbed of $40.75 by two men armed with automatic revolvers, after he was searched and while holding up his hands as ordered by the two robbers. He lived east of Buckner, and in going to and from his work he walked on the Illinois Central railroad track. The railroad runs westerly from Eldorado through Benton, Buckner and Pinckneyville and on to St. Louis, Missouri. The Big Muddy river runs south about half way between Buckner and Benton. The railroad crosses the stream on a steel bridge about sixty feet long. The day aforesaid was pay-day, and Tiberend had collected his pay in money that afternoon and left the mine for home about 4:15 P. M., traveling alone east on the railroad to his home, which is about three-quarters of a mile from the bridge. While crossing the bridge he was met by one of the robbers, whom he positively identified as Mandrell, who had stationed himself near the east end of the

bridge on the south side.  Mandrell, armed with an automatic pistol of 32-caliber, ordered him to "Put 'em up!"  He did not comply with the order at once, and the other robber, whom he identified as Marvel, came up from the rear and pointed an automatic revolver at him of the same caliber and said, "Stick 'em up!  Stick 'em up!"  He then put up his hands, and Mandrell told him to turn his head and to not look at him.  The two robbers then took his miner's lamp and threw it into the river and took the money from his person.  They then ordered him to go on and to not look back.  Both of the men who robbed him had handkerchiefs tied over their faces that came just below the eyes.  He had known Mandrell for more than eight years and had worked with him at one time in the mine and also on a farm.  He was very positive in his identification of Mandrell as one of the robbers, and testified he knew that it was Mandrell by his eyes and his voice and his features.  They kept him there about five minutes.  He was not excited and took time to examine the gun that Mandrell had and saw it was a 32-caliber.  Mandrell wore a brown cap and overalls and did not have on an overcoat.  He had nothing around his neck.  He was not so positive in his identification of Marvel as of the other robber, whom he described as smaller than Mandrell, with dark-looking eyes and of lighter complexion than Mandrell.  He had never known Marvel before the robbery.  He stated that Marvel had on a cap, but he didn't pay much attention to the rest of his clothes.  He stated that he could not be mistaken about the guns being 32-caliber automatic revolvers.  He further stated that after he got home he went to Benton to see the sheriff and the State's attorney.  He also went down to the jail and pointed out Marvel as one of the men who robbed him, without aid from anyone.

The testimony of the prosecuting witness was corroborated by two other witnesses, Charley Sanders and Chalon Smith, (also known as Harmon Smith,) who were held up

at the same place and in the same manner by Mandrell and Marvel as they were coming from the same mine at Buckner. Sanders gave the time he was robbed as just after five o'clock of the same day the prosecuting witness was robbed, and Smith was held up at the same place by the same men about fifteen or twenty minutes before five o'clock P. M. Sanders had known Mandrell for about twelve years and was very positive in his identification of him. He testified that while Mandrell and the other fellow were robbing him the handkerchief over Mandrell's face slipped down a little under his nose. He stated that after the handkerchief slipped down he knew it was Mandrell. Smith had known Mandrell for about two years and they had worked at a mine together. Each of these witnesses was alone when held up, and after the robbers had held Smith up they told him to go on and to not look back. They did not keep anything found on Smith's person. He did not have his pay except in a check or statement, which the robbers took out of his pocket and returned to him after they found he had no money. They only found seventy-five cents on the person of Sanders, which they kept. Sanders stated that it was not dark when they robbed him but that it was getting dark. He was the last of the three to be robbed. Neither Smith nor Sanders had ever known Marvel. They gave it as their judgment that it was Marvel that was with Mandrell when they were robbed.

The evidence for the People was further corroborated by Mrs. Ollie Smith, the wife of Chalon Smith, who lives about a mile east of the bridge and seventy-five feet south of the railroad track. She testified that she knew Mandrell and had known him for seven or eight years; that he passed her house going west on the railroad about seventy-five feet north of her house, with another fellow not quite so tall; that she was sure that one of them was Mandrell but did not know positively who it was with him. She was putting out her washing at the time they passed.

Corroborative testimony was also given on the part of the State by Ralph Newman, who testified that he knew Marvel and had known him for six years; that he also knew Mandrell and had known him about a year; that he saw them both together about 1:30 P. M., two blocks west of the city hall in West City, which is very near Benton, and that they were walking south towards the Illinois Central railroad. Also by Elbert Kearney, who testified that he saw Marvel about six o'clock with Ed Sanders, and that Sanders asked Marvel where he had been, but that he did not understand his answer. He also stated that he had known Marvel about six years. Ed Sanders corroborated Kearney by testifying that Marvel's answer to him was that he had been "down to Joe's." He had known Marvel about one year. These witnesses described Marvel as about five and one-half feet tall, weight about 145 pounds, light complexioned and about twenty years old.

The defense of both defendants was an alibi. They positively denied committing the robbery; denied that they were together on that day after one o'clock but admitted that they were together at that time; denied that they walked on the Illinois Central railroad that day, and Marvel denied walking from West City to Benton at about six o'clock, as testified to by Kearney and Ed Sanders. Mandrell testified that he and Marvel walked to Benton from West City about one o'clock on that afternoon and that they separated at the public square in Benton and that he did not see Marvel again that day; that after he and Marvel separated he went to a cafe where his mother worked, and about 2:30 P. M. went to West City and remained at Gus Adams' saloon until about 5:00 P. M. and then went home to supper. He also stated that he owned a 32-automatic revolver. One of the defendants' witnesses corroborated the State's witnesses by stating that Mandrell had on that day a brown cap and a pair of overalls. His family relatives corroborated him in his statement that he was at home about five o'clock,

306—27

some of them stating the time they saw him at home was about 5:30. Marvel testified that after he left Mandrell on the public square in Benton at one o'clock he went to his father's place of business and obtained money from him to go to a show; that he and Van Sullivan went to the show at 2:30 P. M., remained there until 4:00 P. M., then went to a restaurant and later to his father's place of business and drove home in an automobile, arriving there about five o'clock. He was corroborated by Sullivan, who testified that he went to the show with Marvel that afternoon; also by his father and mother, and by his father's employee, who remembered that Marvel was in his father's place of business on the afternoon in question. He was also somewhat corroborated by other witnesses who testified to seeing him on that afternoon but were not very positive about the precise time.

The evidence which we have related answers *in toto* the claim of their counsel that the defendants were not proven guilty of the crime beyond all reasonable doubt. The evidence is very strong against Mandrell, and the entire evidence is in such condition that we, as a reviewing court, would not be warranted in holding that the jury's verdict and the judgment of the court are not supported by the evidence. The case is one in which the facts testified to by the various witnesses should be settled finally by the verdict of the jury unless prejudicial error has intervened or their verdict is otherwise shown to be based on prejudice or error. In other words, this court cannot substitute its judgment for that of the jury and the trial court and reverse the judgment unless substantial error has intervened. It is the experience of close observers and those who are usually capable of identifying persons of long acquaintance and whom they have not seen for years, that such identity is generally readily made by closely observing such persons from the lower end of the nose upward, and particularly if they remember the color and appearance of the eyes. The

face from the nose upward is that part of the human body that is subject to least change. One of the witnesses who was robbed within just a few minutes of the time the prosecuting witness was robbed, saw the whole upper part of Mandrell's face at one time when the handkerchief slipped down. He was not identifying an old-time acquaintance whom he had not seen for years, but a man whom he had known for years and had seen constantly up to the day of the robbery. He had a first-class opportunity to know him by his eyes, his voice, his complexion and by the whole upper part of his face, as well as by his clothing and otherwise. The other two witnesses held up had almost an equal opportunity. The wife of one of the witnesses, who had known Mandrell for years, saw the two men who evidently committed these robberies, and she is very positive that one of them was Mandrell and thinks the other was Marvel. This testimony, with that of the other corroborating witnesses, cannot be said to make out a very doubtful case, as argued by plaintiffs in error.

"To the general rule that evidence of separate and independent crimes is inadmissible to prove the guilt of a person on trial for a criminal offense there are several exceptions, which are as uniformly accepted by the courts as the rule itself. Among these exceptions is that where evidence tends to aid in identifying the accused as the person who committed the particular crime under investigation, it is admissible in spite of the fact that it tends to show the guilt of the accused of other crimes for which he is not on trial." (3 A. L. R. 1540; *People* v. *Jennings,* 252 Ill. 534; *People* v. *King,* 276 id. 138; *Farris* v. *People,* 129 id. 521.) This court held in the *King case,* on page 145, that evidence of other crimes is admissible when it tends to identify the accused or to locate the accused at the scene of the crime where an alibi is set up as a defense. The evidence in this case was admissible for both reasons: to establish the identity of the robbers and to answer their defense of an

alibi that they were not at the place of the robbery. The very language of the robbers to their victims was corroboration for the State of the manner in which they committed the hold-ups. It was of the very same character throughout, and all three robberies occurred at the same place, and most probably the first and last robberies were not more than thirty minutes apart. In such a case the language used by the robbers in all of the hold-ups is admissible if there is such similarity in language as indicates they were the same robbers; and evidence of the manner in which they committed the robbery, the guns they used and the position of each of the robbers at the several hold-ups is admissible in proof of their identity, if it indicates they were the same persons. The trial court committed no error in admitting the evidence of the other two crimes.

The only error committed by the trial court that we have noticed in reviewing the record was against the People. The ruling was technically erroneous, only. The questions of the People objected to were only objectionable because leading. In such a case it is the duty of opposing counsel to make specific objection that the questions are leading or else the court should overrule the objection, or if the court sustains an objection merely because the questions are leading, and where no specific objection has been made, the court should state that the objection is sustained because the questions are leading. This practice will advise both counsel that the questions are only technically objectionable, and give the one offending against the rule as to leading questions the opportunity to state the questions in proper form. Very valuable evidence was ruled out of this case apparently in the foregoing manner, particularly the testimony of Emmerson Williams, who on rebuttal for the People was asked this question: "You may state to the jury whether or not the defendant Joe Mandrell, and the defendant Willie Marvel, were on the Illinois Central

railroad track in this county at a switch-stand or near a switch-stand on said track, which is west of Benton and about 240 feet east of the crossing of the intersection of the public highway and the Illinois Central railroad track, just east of the residence of Dan Smith." This witness had already answered that he lived one and a half miles west of Benton and had lived there four years; that he had known Mandrell twelve or fourteen years and Marvel six or eight years, and that he had seen them often since he knew them.

There is no reversible error in the record, and the judgment of the circuit court is affirmed.    *Judgment affirmed.*