THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WAYNE ROGERS, Appellant.

*Opinion filed May 26, 1988.—Rehearing denied October 3, 1988.*

Charles M. Schiedel, Deputy Defender, Robert E. Davison, First Assistant Appellate Defender, and Robert D. Seeder, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Terence M. Madsen and Scott Graham, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

In the circuit court of Lake County, defendant, Wayne Rogers, was indicted for murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1) through (a)(3)), attempted murder (Ill.

Rev. Stat. 1983, ch. 38, par. 8—4(a)), armed violence (Ill. Rev. Stat. 1983, ch. 38, pars. 12—4(a), 33A—1, 33A—2), conspiracy to commit murder (two counts) (Ill. Rev. Stat. 1983, ch. 38, pars. 8—2(a), 9—1(a)(1)), and conspiracy to commit armed robbery (Ill. Rev. Stat. 1983, ch. 38, pars. 8—2(a), 18—2). The indictment alleged that defendant conspired with Milton Muntaner and Kristine Locascio to rob and kill Steven McNaulty. The indictment further alleged that defendant committed these crimes and also attempted to kill John Grant.

Following a jury trial defendant was found guilty of murder, attempted murder, conspiracy to commit murder (two counts), conspiracy to commit armed robbery, and armed violence. The jury also found that defendant qualified for the death penalty because he murdered the victim in the course of an armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)), and that no mitigating circumstances existed sufficient to preclude imposition of the death penalty.

We shall first briefly summarize trial testimony regarding the offenses, and then more fully set forth certain testimony as pertinent to discussion of the various issues. At trial defendant testified on his own behalf. The People introduced (over objection) defendant's tape-recorded confession taken two days after the offenses, on the evening of defendant's arrest. The People also called John Grant (a shooting victim) to testify regarding the pertinent events on the night in question.

This testimony revealed that on December 6, 1985, defendant and Locascio drove to Muntaner's house to meet him. Muntaner joined them in the car, loaded a pistol and gave it to defendant. The three then proceeded to carry out a plan which they had discussed the evening before. The details of this plan are subject to dispute but it involved defendant's telling McNaulty that he (defendant) would sell him one-half ounce of cocaine for $900.

Defendant would make no such sale, but would instead kill McNaulty, take his money, and kill the individual accompanying McNaulty (Grant). Defendant would then split the $900 with Muntaner.

Defendant, Muntaner and Locascio proceeded to "Jake's" bar, where defendant had arranged to meet McNaulty. McNaulty was not there (having just left), but defendant reached him by telephone and McNaulty agreed that he and Grant would meet defendant at the entrance of a nearby Holiday Inn in Mundelein.

All five then met at the Holiday Inn. McNaulty left the vehicle in which he, Muntaner and Locascio (the driver) had been riding, and instructed Grant (the driver of the van in which Grant and McNaulty were riding) to follow Locascio and Muntaner. Defendant rode with Grant and McNaulty. (The record does not reveal what, if any, explanation defendant gave Grant and McNaulty to get them to follow the other vehicle.) The five then traveled to a road where Muntaner, Locascio and defendant had determined that the robbery and shootings would occur. Locascio and Muntaner then pulled off the road, and Grant pulled up behind them. As the van came to a stop, defendant emptied his pistol. He fired three bullets at McNaulty's head and three bullets at Grant. Defendant then opened the left front door, and either pulled McNaulty or let him fall from the vehicle. Defendant then dragged him about four feet to the side of the road. Defendant then took McNaulty's wallet and coat. Grant then drove away and defendant started running. Locascio and Muntaner had left in the other vehicle by this point.

Defendant first submits that his tape-recorded confession detailing the planning and commission of the crimes should have been suppressed because the statements were involuntary and also because they were not made following a knowing waiver of his *Miranda* rights

(*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602). More specifically, he contends that because he was under the influence of drugs and also because of a combination of threats and promises by the police, he did not voluntarily and knowingly waive his *Miranda* rights and did not voluntarily confess to the crimes.

It is well settled that to use a confession the People must prove that a defendant knowingly waived his *Miranda* rights. (*North Carolina v. Butler* (1979), 441 U.S. 369, 60 L. Ed. 2d 286, 99 S. Ct. 1755.) However, the circuit court need not be convinced beyond a reasonable doubt on whether the *Miranda* rights were properly waived. (*People v. Torres* (1973), 54 Ill. 2d 384, 393.) Moreover, while not dispositive, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver ***." (*North Carolina v. Butler* (1979), 441 U.S. 369, 373, 60 L. Ed. 2d 286, 292, 99 S. Ct. 1755, 1757.) Further, the circuit court's findings regarding waiver of *Miranda* rights and voluntariness of a confession will not be disturbed unless they are against the manifest weight of the evidence. *People v. Burbank* (1972), 53 Ill. 2d 261; *People v. Torres* (1973), 54 Ill. 2d 384.

We first address the contention that drug use impaired defendant's ability to knowingly and intelligently waive his rights. Defendant testified that up to the time of his arrest he was a chronic drug user. He testified regarding his extensive use of LSD, PCP, cocaine, opium, marijuana, amphetamines and alcohol. He stated that he had begun using drugs in the eighth grade and continued until his arrest. This testimony was buttressed by numerous acquaintances of defendant, all of whom testified that defendant had for years extensively used drugs, including marijuana, cocaine, LSD and alcohol. Defendant

also testified that on the Saturday prior to and the Sunday of his arrest he had taken substantial amounts of drugs. He stated that on Saturday night he used marijuana, cocaine and alcohol, and took four "hits" of LSD. He also testified that on Sunday he took one hit of LSD and smoked marijuana throughout the day.

Defendant's expert witness, Dr. Sidney Schnoll, a physician specializing in chemical dependency and psychopharmacology, testified at the pretrial suppression hearing regarding the effect of the drugs which defendant stated he had taken. Dr. Schnoll diagnosed defendant as suffering from a continuous multiple drug dependency at the time of the offenses and at the time of the confession. He explained that this disorder afflicts people who on a regular basis take many different types of drugs. He testified that this condition deprived defendant of the capacity to make rational decisions, including the decision to waive his rights. Dr. Schnoll stated that due to the duration and the amount of drugs which defendant had taken, his cognitive functions had been impaired. He further stated that when an individual is coming down from drugs (as defendant's testimony indicates he could have been), the impairment to the person's cognitive functions could be as severe as if the person were still intoxicated. In speaking of various impairments which resulted from drug usage the expert did not always distinguish whether an impairment was a residual effect of drugs which might no longer be present in defendant's system or the result of having recently taken certain drugs which were still in his system at the time of his confession.

The circuit court rejected the contention that defendant's drug use impaired his ability to knowingly and intelligently waive his *Miranda* rights. We believe that the circuit judge acted well within his discretion in making this finding. The circuit judge was in the better position

to evaluate the credibility of the defendant and his acquaintances, upon whose statements the expert relied in making his evaluations. The circuit judge's statements indicate that his lack of belief in the defendant was the primary reason for discounting the physician's testimony. The circuit judge stated, "I personally do not believe that the defendant himself has been that credible in his statement."

The circuit court also indicated a more general lack of confidence in the expert witness' analysis. There were good reasons for this. One reason was the articulate manner in which defendant expressed himself during the confession. As the circuit court observed, it is apparent from listening to the taped confession that defendant was speaking intelligently and clearly and seemingly understood the questions posed to him. As the court noted, defendant "even corrected the interrogating officer on one or two occasions, which showed his mental capacity to understand what was being talked about and correct what he considered a misstatement * * *."

We are not persuaded that this apparent coherence is of no probative value in determining whether defendant was impaired by the presence of drugs. It is true that the physician indicated that one cannot be certain whether a person is under the influence of LSD by listening to a recording of his voice. However, the doctor also indicated that different people can react differently to the drug, and some of defendant's friends indicated that when defendant took LSD he would be "more hyperactive," would "laugh a lot" and "when someone would get on his bad side, he would be quick to become hostile." Witnesses also testified that when defendant was on LSD he would get angry if someone challenged him. Considering this testimony, we cannot say that listening to the tape recording was of no legitimate value, and we note that the expert did not even listen to it.

Another reason for discounting the testimony of the expert is that the testimony was in many respects highly speculative. This is particularly true to the extent that he based his opinion on defendant's long-term drug use rather than on the effect of the drugs which defendant had supposedly ingested within the several days prior to his arrest. For example, the expert acknowledged that with respect to LSD use, "in terms of long term post-use consequences, we really don't have any hard information as to what those might be." He also gave such speculative testimony as, "with respect to Mr. Rogers, probably with his continuous use over a period of time there was potential buildup of the drug in his system *** ."

In sum, the testimony of the expert was questionable because its validity depended in part on the credibility of defendant and his friends, and the testimony regarding the effects of prolonged drug use was even more questionable because of its somewhat speculative nature. We conclude that the circuit court's finding that drugs did not invalidate defendant's waiver and confession is not against the manifest weight of the evidence.

We next turn to defendant's contention that his waiver of his *Miranda* rights was rendered involuntary by certain promises and threats of police officers, threats which the officers denied having made. Defendant testified that an interrogating officer told him that he would be locked up in a cell and raped by other inmates if he failed to cooperate. Defendant also testified that he was told that if he failed to cooperate he would likely get the death penalty. An officer purportedly said that he had given three or four people the death penalty and that he "would definitely push it in this matter." The officer allegedly also said that if defendant did cooperate, the officer would see to it that defendant received a less severe sentence. Defendant attempted to bolster

his testimony in this regard by offering testimony of several family members. These family members testified that defendant relayed these threats to them shortly after he made the confession. The court properly excluded on hearsay grounds this particular testimony of the family members but allowed defendant to submit the testimony as an offer of proof.

Detectives Blazincic and Jarzembowski, the two interrogating officers, testified at the suppression hearing. Blazincic stated that the interrogation began at 4:30 p.m. on the day of defendant's arrest and that defendant Rogers initially denied involvement in the crimes. Blazincic stated that, for reasons unknown to him, defendant changed his mind and confessed to the offenses. Both officers testified that defendant was not threatened or given assurances of leniency in return for his inculpating statements and that he only briefly denied his involvement before beginning his self-incriminating explanations. The officers indicated that they continued to get more information from him before the taping began and that only Blazincic and defendant remained in the interview room when the confession was taped. Blazincic stated that he began taping defendant's confession at 7 p.m.

What transpired during the 2½-hour period between when the interrogation commenced and when defendant's confession was taped? Only the two interrogating officers and defendant could provide the judge with eyewitness accounts to assist him in this determination, a determination which obviously turned largely on an evaluation of the credibility of the witnesses. After reviewing the record we have concluded that the circuit court's finding that the alleged threats and promises were not made is not against the manifest weight of the evidence. We do not believe that certain inaccuracies in the officers' testimony (such as with regard to the number of

times the tape was stopped during the interview) render the officers' testimony less than credible.

Defendant asserts as a separate argument that the confession itself was involuntary. However, under the circumstances of this case, we find (as did the circuit court) that the issues of whether the waiver was valid and whether the confession was voluntary are inseparably intertwined. Defendant's grounds for asserting that the confession was involuntary are the same grounds used in arguing that the waiver was invalid, namely, drug impact, threats and promises. As we have already indicated, we cannot say that the circuit court erred in refusing to believe defendant's and the expert's testimony regarding these issues. Accordingly, we cannot say that the circuit court's finding that the confession was voluntary was against the manifest weight of the evidence.

Defendant next submits that the circuit court erroneously precluded his counsel from referring to the intent requirement during the opening statement and that therefore the jury might have failed to give due consideration to whether defendant had an intent to kill. At the outset of his opening statement, defense counsel told the jury:

"The prosecution must prove Mr. Rogers is guilty, primarily of the offense of murder, and that the others as well, beyond a reasonable doubt. And in dealing with that, we expect the evidence to show that there will be issues raised concerning certain of the elements of what constitutes the crime of murder. One of the issues, one of the issues is the question of intent."

At this point the People objected, and an in-chambers conference was held. The prosecutor argued that reference to an intent requirement was improper since "as the defendant is charged in the indictment, it is not intent. The requisite mental state is knowledge." When

the prosecutor made this assertion, he failed to consider (and defense counsel failed to point out) count I of the indictment, whereby defendant is expressly charged with murder on the basis that defendant shot decedent "without lawful justification and with the intent to kill." The court, erroneously relying on the People's assertion that intent was not in issue, stated:

"I will sustain the objection as to the word 'intent' but certainly you would be able to establish what your defense is in relation to the mental state of the defendant, and since the indictment reads in the word 'knowledge' rather than 'intent,' then I think you should proceed possibly that way."

Defense counsel then continued his opening statement referring to knowledge rather than intent.

We believe it is clear that, had the circuit judge considered count I in making his ruling, he would have permitted defense counsel to mention "intent" in his opening statement. The People argue that the court would still have been required to exclude reference to an intent requirement in the opening statement, since only the court, not counsel, can issue jury instructions. However, from our review of the record it appears that defense counsel was not attempting to instruct the jury but was merely trying to apprise the jury of what he intended to prove through expert testimony.

It is therefore apparent that the court erred in precluding reference to intent in the opening statement. While the scope and latitude of an opening statement are subject to the circuit court's discretion, the accused has the right to have his attorney summarize in an opening statement, without unreasonable restrictions, the facts which he intends to prove. *People v. McDowell* (1918), 284 Ill. 504.

Although we find that the circuit court erroneously restricted defense counsel's opening statement, we are

convinced beyond a reasonable doubt that the error was harmless, for several independently sufficient reasons. First, it is clear that the jury understood that intent was one of the many issues to be considered in the case. Defense counsel was not precluded from using the term "intent" when examining the expert and other witnesses at trial. He instead chose, however, to use the expression "mental state" when examining the expert, an expression obviously meant to fairly encompass both knowledge and intent. The jury would reasonably have understood from the examination of the expert that intent was a consideration. Moreover, any conceivable ambiguity in this regard was clarified by the jury instructions, which articulated the various elements of the alternate murder charges, including (with respect to the first indictment) the intent requirement.

The other reason that the error was harmless is that, although the jury returned a general verdict on the murder charge and thus did not specify the basis upon which it found the defendant guilty of murder, it is clear that the jury would have found defendant guilty of murder regardless of its conclusion about defendant's intent to kill. The reason is that the jury was convinced beyond a reasonable doubt that defendant committed the killing in the course of an armed robbery and was guilty of murder on this basis. This is evident from the fact that, during the first stage of the sentencing hearing, the jury, having no more evidence regarding armed robbery than it had during the trial, found beyond a reasonable doubt that defendant committed the killing in the course of an armed robbery.

Defendant next submits that the circuit court erroneously restricted defense counsel's examination of the expert witness concerning the impact of drug usage upon defendant's mental state. Defendant submits that as a

result of this restriction he was unable to adequately present his statutory defense of voluntary intoxication.

Section 6—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 6—3) provides, in pertinent part, that "[a] person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition *** *[n]egatives* the existence of a mental state which is an element of the offense ***." (Emphasis added.)

Our review of the record indicates that defense counsel was not unfairly restricted in his cross-examination of the expert regarding negation of mental state. The record indicates that at trial defense counsel on several occasions asked the expert whether defendant's mental state was negated. During direct examination the following exchange occurred between defense counsel and the expert witness:

> "Q. Doctor, do you have an opinion based upon a reasonable degree of medical certainty and based upon your history given by Mr. Rogers in the interview at the time suggested, and based upon your prior educational background and your own experience as to whether or not Mr. Rogers' multiple drug dependency on December 6, 1985, could have impaired his cognitive functions to such an extent to negate his mental state?
>
> A. Yes, I do.
>
> Q. And what is that opinion, Doctor?
>
> A. That his multiple drug use, the number of drugs he was taking, the length of time he was taking them, impaired his ability to think clearly."

This answer obviously did not indicate that defendant's mental state was negated, and the People objected, indicating that the expert's testimony in this regard would be relevant to the intoxication defense only if he testified that the intoxication negated (rather than merely impaired) defendant's mental state. The objection was sustained.

Shortly thereafter (and after several sidebar and in-chambers conferences regarding this issue), the following exchange occurred between defense counsel and the expert witness:

"Q. Doctor, based upon your past experience, based upon your own prior experience, based upon your history-taking of Mr. Rogers, and based upon a reasonable degree of medical certainty as to whether or not Mr. Wayne Rogers, at the time he purportedly pulled the trigger on December 6th, 1985, that his cognitive functions were so impaired that it would negate the mental state he would have?

A. Yes.

Q. What is that opinion?

A. That the amount of drugs that he was taking and the continued use of those drugs, sufficiently altered his consciousness, his ability to think, that he would not be able to make reasonable decisions."

This doctor's answer again obviously fell far short of stating that defendant's mental state was negated at the time of the shootings, and instead placed before the jury more testimony that the drugs altered defendant's ability to "make reasonable decisions." The prosecution objected and the court ordered the response stricken.

In a subsequent in-chambers conference, defense counsel indicated that he was surprised by the doctor's responses to these questions and that these responses differed from what the doctor had indicated in conferences with defense counsel prior to testifying. Defense counsel indicated that the doctor needed a chance to further explain his answer. The circuit court stated that "each time he has answered, he said it impaired his ability to rationally consider what he was doing and this is wrong and you knew this was wrong." Defense counsel then submitted, as an offer of proof, a question which he would, if given the opportunity, ask the doctor. Defense counsel stated:

"So the question I would have asked, I'm not going to do it in front of the jury because the court has instructed me not to, is, 'Doctor, do you have an opinion as to whether or not on December 6, 1985, at the time Mr. Rogers purportedly pulled the trigger, and based upon a reasonable degree of medical certainty as to whether or not his cognitive functions were impaired to the extent that it negated his mental state?' That's the question I would ask."

This question is obviously substantially identical to the questions which defense counsel had already posed and to which the doctor had already responded with largely irrelevant testimony. The fact that during his subsequent sentencing hearing testimony the doctor gave a more responsive answer to such a question does not alter the propriety of the court's ruling in this regard during trial.

Defendant's taped confession and trial testimony indicated that Scott Lutchen did not participate in the December 6, 1985, incidents due to a schedule conflict but did play at least a limited role in planning the robbery and murder of Steven McNaulty. Defendant's next issue on appeal relates to testimony of Lutchen, whom the People called as a witness at trial. Specifically, defendant contends that the circuit court violated his sixth amendment right to confrontation by unduly restricting his cross-examination of Scott Lutchen. Defendant contends that defense counsel was restricted from fully cross-examining Lutchen as to what he was told by the police in their efforts to persuade him to cooperate in their investigation and prosecution of the offense. Defendant indicates that Lutchen's credibility was questionable because he was at risk of being charged as a coconspirator to murder and armed robbery; defendant submits that, because of this risk, he told police a story which would exculpate himself and inculpate defendant.

The record indicates that the circuit court repeatedly sustained general objections to questions that sought information highly relevant to the witness' credibility. For example, the court sustained an objection to the following question: "What were their [the detectives] words to you, and what were your words in response to them when they first got you to the police station?" The court also sustained the People's objection to defense counsel's question as to the length of time Lutchen denied knowledge of the homicide. The court further sustained an objection to defense counsel's question about whether Lutchen had said anything to the detectives before arriving at the police station. The court also sustained the People's objection to defense counsel's question regarding whether Lutchen believed the detectives' threats of charges being filed against him and whether Lutchen was told that no such charges would be filed if he cooperated.

In sustaining some of these objections, the court erroneously considered the hearsay rule as a bar to the testimony. Defense counsel was not attempting to elicit the out-of-court statements to prove the truth of the matter asserted therein, but was merely attempting to show that such statements were made and that they may have motivated the witness to give false testimony. Regarding some of the other objections, the court indicated that the questions not only called for hearsay but called for irrelevant information. We disagree, for we believe that this line of questioning was a legitimate attempt to cast doubt on Lutchen's veracity. The court's reasons for sustaining objections to some of the other questions are completely unclear. This court has indicated that a court should either overrule a general objection or indicate the basis for disallowing the question. (See *People v. Mandrell* (1923), 306 Ill. 413.) Instead, the court often merely disallowed the questions.

The scope of cross-examination is largely within the discretion of the circuit court. In our view, however, the record indicates that in some instances the court misapprehended the applicability of the hearsay rule and in other instances the court failed to recognize the broad latitude which a defendant is to be accorded in probing bias.

Although we find that the circuit court overly restricted the scope of cross-examination, we are convinced beyond a reasonable doubt that defendant was not prejudiced by the circuit court's conduct in this regard. The reason is that the jury heard Lutchen give extensive testimony which indicated his potential bias. Lutchen testified that, two days after the shootings, Lake County detectives took him from his place of employment to the police station. He testified that the detectives said that they would charge him with conspiracy to commit murder if he refused to cooperate with them. He further stated that he initially denied any knowledge of the crimes but indicated that he eventually succumbed to the detectives' pressure. Lutchen testified that it was after the officers read portions of Rogers' confession that he told the officers everything he knew. Although he did not remember exactly which pages of Rogers' statement had been read to him, he did know that the portions read to him "dealt directly with the things" which Lutchen eventually told the officers (i.e., the conversations and conduct in which Lutchen participated or witnessed). Under these circumstances it is clear that the jury well recognized Lutchen's potential incentive to lie. The jury had learned that Lutchen initially lied to the police, that he was threatened with being charged with a serious criminal offense, that he .was read portions of defendants' statement which referred in part to him, and that he eventually told the police a story inculpating defendant and exculpating himself. Thus, in our view ample im-

peachment evidence was presented, and any error in this restriction of the cross-examination of Lutchen was harmless beyond a reasonable doubt. (See *People v. Owens* (1984), 102 Ill. 2d 88; *cf. People v. Triplett* (1985), 108 Ill. 2d 463; *People v. Barr* (1972), 51 Ill. 2d 50 (involving absolute prohibitions into a witness' incentive to fabricate in order to obtain leniency).) Defendant was not deprived of his constitutional right to confront witnesses against him.

As his next issue on appeal, defendant submits that the circuit court erroneously precluded him from introducing evidence (namely, expert testimony) of an "involuntary drugged condition resulting from a chronic multiple drug dependency." Defendant contends that, had the circuit court allowed the expert witness to do so, the witness would have testified that defendant's drug use was "involuntary" due to his addiction. We agree with the appellate decisions indicating that the General Assembly, in using the expression "involuntary intoxication," was contemplating intoxication induced by some external influence such as trick, artifice or force. (See *People v. Downey* (1987), 162 Ill. App. 3d 322; *People v. Larry* (1986), 144 Ill. App. 3d 669; *People v. Walker* (1975), 33 Ill. App. 3d 681.) Consequently, defendant's theory of "involuntary" drugged condition due to drug addiction was not a viable defense.

Defendant next claims that he was wrongfully precluded from asserting the insanity defense at trial. Defendant points to the following exchange which occurred between defense counsel and the expert witness at trial:

"Q. Now, Doctor, as a consequence of your educational background, and as a consequence of your interview with Mr. Rogers, do you have an opinion based upon a—a degree of medical certainty as to whether or not Wayne

Rogers on December 6th, 1985, was under the influence of—of—of any drugs?

A. Yes.

Q. And with respect to whether or not he was under the influence of any drugs, what is that opinion?

A. That he was under the influence of drugs.

Q. And Doctor, based upon a reasonable degree of medical certainty, and your educational and—and prior background, do you have an opinion as to whether or not as a consequence of that condition Mr. Rogers on December 6th, 1985—as a consequence of the use of those drugs, was he deprived of the substantial capacity to either appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law?"

The court sustained an objection to this question. It is absolutely clear, however, that this question was only meant to elicit whether as a consequence of being under the influence of drugs, defendant lacked substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. From this exchange it is clear that defense counsel intended that the question relate to the defense of involuntary intoxication (Ill. Rev. Stat. 1987, ch. 38, par. 6—3(b)), and not to the defense of insanity (Ill. Rev. Stat. 1987, ch. 38, par. 6—2). This fact is further evidenced from the in-chambers conference addressing this objection, during which conference the court and counsel focused on the involuntary-drugged-condition defense, and counsel argued about whether an addict takes drugs "voluntarily" or "involuntarily." Further, at one point defense counsel specifically told the circuit court that defendant was not alleging insanity as a defense. Moreover, even in defendant's post-trial motion he did not mention the insanity defense. Thus, there is no basis upon which to claim that the circuit court erroneously *precluded* defendant from asserting the insanity defense.

We further find that, even if the lack of this expert's testimony regarding the insanity defense resulted from either the court's or counsel's error, defendant's constitutional rights were not thereby prejudiced. We have already held that defendant's drugged condition was voluntary as a matter of law, and it is well settled that a "voluntary intoxication or a voluntary drugged condition precludes the use of the insanity defense *unless* the mental disease or defect is traceable to the habitual or chronic use of drugs or alcohol [citation] and such use results in a 'settled' or 'fixed' permanent type of insanity." (Emphasis in original.) *People v. Free* (1983), 94 Ill. 2d 378, 408.

It is clear from Dr. Schnoll's recorded testimony that he would not in good faith have been able to testify to a reasonable degree of medical certainty that defendant had a fixed or settled substantial inability to appreciate the criminality of his conduct or to conform his conduct to the law. This is apparent for several reasons. First, although Dr. Schnoll's testimony indicates some long-term deficiencies resulting from drug use, it is apparent that in his view these long-term deficiencies are not of such a magnitude as to render the insanity defense applicable. In this regard the following exchange is pertinent:

"Q. On a daily basis, in your opinion, is Mr. Wayne Rogers capable of using his cognitive functions to reason as a mature 21 year old?

A. I think that at this point it would be very difficult for him to do that based on his long term history of drug use. As I stated before, the people who begin to use drugs at a very early age, often have an arrested development at the time they started to use drugs, so if he started to use drugs at the age of 13 or 14, his functioning would be more on the line of an adolescent, more than a mature 21 year old adult.

Q. When you talk about adolescence, give us the framework of those years.

A. I'm defining adolescence from about the age of 13 or 14 to the age of 19 or 20.''

Thus, in Dr. Schnoll's view, defendant's cognitive capabilities at the time of trial and sentencing were that of an adolescent. One certainly could not conclude that by virtue of adolescence one lacks the ability to appreciate the criminality of murder or to conform one's conduct to the law.

Moreover, it is clear that in Dr. Schnoll's view any substantial inability of defendant to control his conduct was due to the presence of drugs in his system, or to the symptoms caused by withdrawal, rather than any permanent condition. This is indicated by the following exchange:

"Q. Doctor, do you have an opinion as to whether or not, based upon a reasonable degree of medical certainty, Mr. Rogers' history of the events of December 8, 1985, and your own educational background and experience as to whether or not Mr. Rogers' cognitive functions were impaired at approximately 4:30 on December 8, 1985 [the date of his arrest], so as to not make rational decisions in his own interest?

A. Yes.

PROSECUTOR: Objection to the phrase 'in his own interest.'

DEFENSE COUNSEL: Strike the words, 'in his own interest.'

Q. Do you have an opinion?

A. Yes.

Q. What is that opinion?

A. That Mr. Rogers was impaired at that time from his drug use, and also from the possibility of withdrawal symptoms that were starting at that time.

Q. And what would be the effect of that impairment on his ability to make rational decisions?

A. It would alter his ability to make decisions because of the discomfort caused by the withdrawal symp-

toms and the inability to think clearly, caused by the intoxication from the drugs.''

Further indicating that in Dr. Schnoll's view any substantial inability of defendant to conform his conduct to the law was temporary was Dr. Schnoll's testimony (during the sentencing hearing) that even in a penal institution ''significant inroads could be made to assist Mr. Rogers in doing away with [his] drug problem.'' Considering Dr. Schnoll's testimony as a whole, we are convinced that he could not in good faith have rendered a professional opinion that defendant's ability to conform his conduct to the law was permanently and substantially impaired.

As his next basis for reversal, defendant submits that with respect to three prospective jurors, Louise Kutzler, James Atkinson and Dallas Evans, the court erroneously sustained objections to certain questions relating to the jurors' views of the death penalty. We shall discuss individually the *voir dire* of these three prospective jurors. With regard to venirewoman Kutzler, the parties overlook that, although defendant initially used a peremptory challenge to remove her, the court and the People later agreed that she would be deemed removed for cause, and defendant would be allowed an additional peremptory challenge. We further note that her dismissal had nothing to do with her views about the death penalty but related instead to her bias against drug users.

With respect to venireman Evans, defendant claims that the court erred in sustaining an objection to the following question:

"Q. If you were a member of the jury and if the jury were to find Mr. Rogers guilty of the offense of murder, would you be inclined at that point in time just because he was found guilty of the offense of murder to impose the death penalty?''

When sustaining a general objection to this question, the court did not indicate the reason it deemed the question improper. Subsequently, defendant peremptorily dismissed Evans and then an in-chambers conference was held, at which defendant requested that the dismissal be for cause. During this conference the court indicated that the question was objectionable because it required the venireman to speculate as to what sentence the court would impose upon finding defendant guilty.

Ideally, the court should have indicated the basis for sustaining the objection at the time the objection was sustained. However, defense counsel did not inquire into the basis of the objection, as he had on other occasions, and in reviewing the record the reason for defense counsel's failure to immediately so inquire becomes apparent. By this point there had been repeated inquiries by defense counsel of various venirepersons as to whether their biases toward either the death penalty or drug users/dealers would substantially impair their ability to follow the court's instructions and decide the case fairly and impartially. Counsel clearly recognized that the court deemed both areas of inquiry permissible. The court, however, had repeatedly sustained objections to questions which either misstated the law on these matters or asked the jurors to speculate as to the verdict or sentencing, and counsel for both parties clearly recognized that objections to such inquiries were repeatedly being made regarding form. In our view, the court was correct in sustaining the objection to the question, defense counsel understood the basis of the objection, and defendant was not denied an opportunity to inquire through properly formed questions into this subject matter.

Moreover, we are convinced beyond a reasonable doubt that any potential error in sustaining the objection to this question was harmless. Prior to empaneling Mr.

Evans, the court explained to him in pertinent part the following:

"Under Illinois law, one of the potential penalties which may be imposed upon the finding of guilty of murder is the death penalty. A finding of guilty in itself does not require the imposition of the death penalty. If there is a finding of guilty, a separate hearing is held by the jury to determine if the death penalty is to be imposed. At such a hearing, all reasons for and against imposing the death penalty will be considered."

Having been so informed, Mr. Evans promised to follow the law regardless of his personal feelings of whether the law is correct and promised to give a fair trial to both the defendant and the People. He stated that he recognized that a guilty verdict does not require the death penalty, and he further noted that he had no moral, religious or philosophical scruples that would cause him to be in favor of the death penalty. Under these circumstances, we are confident that defendant had ample opportunity to disclose any potential biases of Mr. Evans regarding the death penalty and was not prejudiced by any possibly erroneous ruling of the court as to questions posed to Mr. Evans on this subject matter.

With respect to venireman Atkinson, the particular question which defendant points to was improper as to form; defense counsel was including in his question an erroneous instruction as to the law of aggravating and mitigating factors. The circuit court properly sustained the objection, stating, "I don't think that they need to be educated as to what the law is at this time."

We note that, prior to questioning, Mr. Atkinson was given the same explanation (quoted in part above) regarding the death penalty as was Mr. Evans. Following that explanation, Mr. Atkinson promised to keep his deliberations free from any prejudice and promised to follow the law as the judge would give it to him. Specifi-

cally with respect to the death penalty, defense counsel was permitted to inquire of him as follows:

"Q. In any event, the fact that the prosecution may be able to prove a case where, indeed they show from the facts presented, the evidence if testified to under oath, that Mr. Rogers committed the offenses charged, would that in your mind automatically mean that Mr. Rogers should be executed?

A. No.

Q. You understand as His Honor has indicated that there are other significant factors that are yet—that would be involved for you as a juror to consider in determining whether that prospect should occur or not?

A. Yes.

Q. And you before you would vote to execute someone would consider the factors—the aggravating factors, and lack of mitigating factors—to be sufficient before you would vote to remove [someone] permanently from society, would that be a fair thing to say?

A. Yes."

Viewing the *voir dire* of Mr. Atkinson as a whole, we are certain that defendant was not deprived of an adequate opportunity to determine whether any potential bias of Mr. Atkinson regarding the death penalty would impair his ability to fairly decide whether to impose the death penalty in this case.

Having determined that no error exists sufficient to warrant reversal of defendant's convictions, we now turn to errors which are alleged to have occurred during sentencing. During the first phase of the sentencing hearing (the purpose of which was to determine whether defendant qualified for the death penalty), the court without objection took judicial notice of the evidence that was presented in the case during the trial and directed the jury to consider that evidence in their deliberations as to the qualifications of defendant for the death penalty. Neither party introduced additional evidence, other

than a certified copy of the defendant's birth certificate, which was used to establish that defendant was over 18 at the time of the alleged offenses.

Defendant objects to the circuit court's decision to submit certain exhibits to the jury during the first phase of the sentencing hearing. These exhibits include the clothes which defendant wore on the night of the shootings, the gun used in the shootings, a life photo of McNaulty, and photos depicting the wounds of Grant and McNaulty.

Although defendant does not directly challenge the propriety of submitting these exhibits during the guilt-determination stage, we find it useful to address this issue in order to evaluate the propriety and potential impact of resubmitting these exhibits to the jury during the death penalty qualification stage. The reason is that, in ruling that the jury could take the exhibits into the jury room during the death penalty qualification stage, the court relied on its ruling that the jury could view such exhibits during their deliberations regarding defendant's guilt or innocence.

The decision of whether to allow jurors to take exhibits into the jury room is left to the discretion of the circuit court, whose decision will not be overturned absent an abuse of that discretion to the prejudice of defendant. (*People v. Williams* (1983), 97 Ill. 2d 252, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) We have reviewed the photographs depicting the wounds and cannot say that the circuit court abused its discretion in permitting the jurors to examine them during their deliberations regarding guilt. Defendant's mental state was at issue and the photographs depicting the victims' wounds helped refute any claim that defendant's conduct was less than intentional or was without knowledge of the risk of injury. Likewise, examination of the weapon used is clearly relevant both to link

defendant with the crimes and to establish his intent at the time of the incidents. Also, examination of the clothing which defendant wore on the night in question and which he gave to friends to discard is relevant. Not only does such evidence link defendant to the crime but, by indicating an attempt to discard any incriminating evidence, it is probative of his mental state at the time of the crimes.

While we fail to see the relevance of introducing a life photo of McNaulty, we have examined the photo and are certain that any error in introducing this innocuous picture and sending it to the jury room was harmless beyond a reasonable doubt.

Having addressed the propriety of submitting these exhibits to the jury during the guilt-determination deliberations, we can now focus on defendant's argument regarding these exhibits. Rather than arguing that the exhibits were improperly submitted at the guilt-determination deliberations, he contends that the issues pertinent to the death qualification deliberations were wholly distinct from the issues pertinent to guilt determination, and that therefore the circuit court erroneously relied on its prior ruling when resubmitting the exhibits. Defendant argues that, had the circuit court properly distinguished the relevancy of these exhibits at trial from the relevancy of these exhibits for the death eligibility determination, the court would have found the exhibits inadmissible.

In our view, there was a tremendous similarity of issues in both the guilt-determination stage and the first phase of the sentencing hearing. In this regard we note that as its basis for invoking the death penalty, the People relied on section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). That provision authorizes the death penalty for one (over 18 years of age at the time of the offense) who is found

guilty of murder if in the course of an armed robbery the defendant committed the murder "with the intent to kill the murdered individual or with knowledge that his acts created a strong probability of death or great bodily harm to the individual or another." The jury thus potentially had to consider during sentencing whether an armed robbery had occurred, whether the murder was committed in the course of the armed robbery, and whether the defendant had an intent as stated in the quoted statutory provision. Contrary to defendant's assertion, it is not clear that the only issue in the first phase of the sentencing hearing was whether an armed robbery had occurred. At the guilt-determination stage the jury had returned a general verdict against a defendant charged with alternate counts of murder based on various mental states (including felony murder, which would not necessarily require either an intent to grievously injure or knowledge of a strong possibility of such harm). Thus, except with regard to the life photo of McNaulty (discussed above), we cannot say that it was inappropriate to submit the exhibits during the death penalty qualification stage. Our conclusion applies not only to the gun, clothes and photos depicting decedent's wounds, but also to the photos depicting Grant's wounds. We cannot say that the circuit court abused its discretion in submitting the pictures of Grant, since he was shot in conjunction with the shooting of defendant. Evidence of the close-range gunfire at Grant, which occurred within seconds of the shooting of decedent, is of some value in evaluating defendant's mental state and determining whether he was in fact attempting to rob and murder decedent.

Defendant also submits that numerous errors occurred during the second portion of the sentencing hearing, in which the jury was asked to consider aggravating and mitigating circumstances, and to determine whether

there were any mitigating circumstances sufficient to preclude imposition of the death penalty.

As a mitigating consideration, defendant argued that his criminal history should not be deemed significant. Defendant also contended that because of the effect of drugs on his system he was acting under the influence of an extreme mental or emotional disturbance, and he introduced expert testimony on this issue. He also contended that he had a good chance for rehabilitation. To support this contention he introduced testimony of family members and other acquaintances who testified as to his generally good nature and his consideration for others. He also introduced testimony of a religious minister who testified regarding his religious interests expressed while in prison. Finally, he argued that he was remorseful.

As aggravating circumstances, the People introduced evidence that defendant had pleaded guilty to a charge of telephone harassment and also introduced testimony from the victim of the offense. The People also introduced certified copies of defendant's convictions for retail theft and unlawful possession of marijuana. The People also introduced testimony of defendant's various probation violations.

Although setting forth each of the above aggravating factors, the People focused their argument largely on the nature of the crime. The People argued that "[t]he nature of the crime is the most serious aggravating factor." The People stated that, "[w]hen you recall when this plan of his initially developed in his own mind, it was for $900 that he was going to kill Steven McNaulty. He decided it then that Steve McNaulty's life was worth $900." The People further stated that "[defendant] lied to you, and he told you that in his mind he was only planning to rob, and it was someone else's idea to kill. Well, Scott Lutchen and Kristine Locascio and Milton

Muntaner have all told you the idea to kill came from this man. From Wayne Rogers."

It is certain testimony regarding the planning of the crime which defendant finds objectionable. Specifically, he objects to the introduction of the tape-recorded confessions of codefendants Muntaner and Locascio, confessions to which the prosecutor was referring in the argument quoted immediately above. In these confessions, which were played for the jury, the codefendants acknowledged a limited role in planning and participating in the crimes, but also contended that the idea to rob *and kill* McNaulty originated strictly with Wayne Rogers, and that they initially attempted to discourage defendant from committing the crimes. This testimony stands in stark contrast to the account of the planning which defendant set forth in his post-arrest confession. He contended that Milton Muntaner told him to kill McNaulty when robbing him and later (upon learning that Grant would also be present) told defendant to kill Grant as well. Indeed, the People even acknowledged before the circuit court that the relevance of these codefendants' confessions was in regard to who "the real motivating party" was.

Considering the fact that the jury heard expert testimony indicating that as a result of drug abuse defendant may have been overly subject to suggestion and persuasion by others, considering the critical differences in the accounts given by the codefendants as compared to defendant, and further considering the prosecutor's argument that the cold-blooded, preplanned nature of the crime is "the most serious aggravating factor," it is clear that any error in admitting these codefendants' hearsay confessions could well have impacted the jury's decision that defendant must die for his offenses. As explained below, we find that these tape-recorded confes-

sions were in fact erroneously admitted and that therefore a new sentencing hearing must be ordered.

It is well settled that section 9—1(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(e)) allows the introduction of evidence during the second stage of a death penalty sentencing hearing regardless of whether it would be admissible during the guilt phase of the trial. (*People v. Lyles* (1985), 106 Ill. 2d 373, 414.) We have stated that during the second phase of the sentencing hearing the determination of the admissibility of evidence lies within the sound discretion of the circuit court, and that at sentencing the factors controlling the admission of evidence which would be inadmissible at trial are relevance and reliability. (*Lyles*, 106 Ill. 2d at 414.) However, the United States Supreme Court has labeled "presumptively unreliable" accomplices' confessions that incriminate a defendant. (*Lee v. Illinois* (1986), 476 U.S. 530, 541, 90 L. Ed. 2d 514, 526, 106 S. Ct. 2056, 2063.) Although the Court made this statement in reference to testimony used for determining guilt rather than for sentencing, the statement was "premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect." 476 U.S. at 541, 90 L. Ed. 2d at 526, 106 S. Ct. at 2062.

The presumption of unreliability is particularly strong with regard to the two taped confessions at issue here. The codefendants made the taped confessions shortly after their arrests, and after the police had already had an opportunity to interrogate Grant and defendant. It is thus difficult not to suspect that Locascio and Muntaner had been confronted with evidence of their involvement and felt the need to acknowledge the facts which they believed the police already knew, while minimizing their own roles as much as reasonably possible. Moreover, at

the time of these arrests Locascio was Muntaner's girlfriend, and prior to their arrests Locascio had had an opportunity to read newspaper accounts indicating that the police knew who the offending parties were, as Locascio acknowledged. Locascio also admitted that she and Muntaner had several conversations between the time of the offenses and the time of their arrests. The two thus might well have discussed how they would answer questions should they be arrested.

Muntaner's taped confession is extremely suspect. Listening to the taped confession certainly leads one to the conclusion that he is at least in some instances distorting the truth. He acknowledges that he supplied the gun three days in advance of the crime and that he accompanied defendant on the night of the incidents, yet he extraordinarily claims that he tried to discourage defendant from committing either robbery or murder.

Muntaner's testimony is rendered further suspect by the prosecutor's acknowledgement that the reason the prosecutor did not call Muntaner to the stand is that he had very poor demeanor. Essentially, the prosecutor was apparently concerned that the jury might not believe Muntaner if they could see him testify. An additional reason for doubting the reliability of Muntaner's statements is evidence (testimony of defendant) that Muntaner dealt in drugs, belonged to a Chicago gang, and had acknowledged to defendant that he had killed people before.

Considering the strong indicia that the taped confessions of Locascio and Muntaner were not reliable, we cannot agree with the People that there are sufficient indicia of reliability to overcome the presumption of unreliability and justify admitting the hearsay evidence. The only indicia of reliability which the People note is that the confessions "interlock on all material elements of the planning and commission of the crime" and that the statements were against the declarants' penal interests.

The confessions belie these assertions, for reasons which we have already discussed.

Because we find that the highly prejudicial confessions of Locascio and Muntaner were erroneously admitted during the second phase of the sentencing hearing, we remand this case to the circuit court of Lake County so that the second phase of the sentencing hearing can be conducted anew. Accordingly, we need not address additional errors which defendant submits occurred.

*Affirmed in part; reversed in part; cause remanded.*