(No. 81595

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ARLIE RAY DAVIS, Appellant.

*Opinion filed December 31, 1998.—Rehearing denied February 1, 1999.*

318

HARRISON, J., concurring in part and dissenting in part.
HEIPLE, J., joined by FREEMAN, C.J., and MILLER, J., dissenting.

Charles Schiedel, Deputy Defender, and Charles Hoffman, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Ted J. Hamer, State's Attorney, of Cambridge (Barbara A. Preiner, Solicitor General, and William L. Browers, Arleen C. Anderson and Steven R. Splitt, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Arlie Ray Davis, was charged in Henry County with five counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2), (a)(3) (West 1994)), two counts of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(2), (a)(4) (West 1994)), and one count each of criminal sexual assault (720 ILCS 5/12—13(a)(1) (West 1994)), kidnapping (720 ILCS 5/10—1(a)(1) (West 1994)), aggravated kidnapping (720 ILCS 5/10—2(a)(3) (West 1994)), robbery (720 ILCS 5/18—1(a) (West 1994)), and concealment of a homicidal death (720 ILCS 5/9—3.1(a) (West 1994)). These charges related to the August 1995 murder of Laurie Gwinn in Kewanee, Illinois. The jury returned verdicts of guilty against defendant on all counts, and the circuit court entered judgment thereon.

At the first phase of a bifurcated capital sentencing

hearing, the jury found defendant eligible for the death penalty on three grounds: (1) that the victim was murdered in the course of the commission of the felony of aggravated criminal sexual assault; (2) that the victim was murdered in the course of the commission of the felony of aggravated kidnapping; and (3) that the victim was murdered in the course of the commission of the felony of robbery. 720 ILCS 5/9—1(b)(6) (West 1994). Defendant waived his right to a jury for the second phase of the sentencing hearing. After considering evidence in aggravation and mitigation, the circuit court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced defendant to death. The circuit court also imposed prison sentences of 3 years for concealment of a homicidal death, 6 years for robbery, 20 years for aggravated criminal sexual assault, and 15 years for aggravated kidnapping, the latter two sentences to run consecutively. The circuit court vacated the remaining convictions as lesser-included offenses.

Defendant filed a post-trial motion requesting a new trial and sentencing hearing, which the circuit court denied. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

## FACTS

The State's evidence showed that, on Monday, August 21, 1995, Laurie Gwinn was reported missing after she failed to arrive at her job with the county health department. The next day, sometime after 11 a.m., Gwinn's dead body was found floating in the Hennepin Canal north of Annawan, Illinois. She was nude and was missing several pieces of expensive jewelry that she always wore.

Dr. Violette Hnilica, the forensic pathologist who performed the autopsy, testified that the body was decomposing and swollen. Hnilica used dental records to

make a positive identification of the body as Gwinn. She also identified injuries to the body including torn skin on the right side of the mouth and cheek; "broken back" fingernails; bruises on the upper abdomen, shoulders, and right side of the head; hemorrhages and tissue compression in the neck; a blunt-force injury to the scalp; and bruises in the vagina. Hnilica stated that the cause of death was strangulation and blunt-force injuries, and that the victim's injuries were consistent with sexual assault.

A Kewanee police officer testified that Gwinn was his friend. At 10 p.m. on Sunday, August 20, 1995, the officer saw Gwinn at Graf's, a local tavern. The officer also saw defendant there.

Monica Grasty testified that she tended bar at Graf's from 5 p.m. on August 20, 1995, until 1:30 a.m. on August 21, 1995. At about 5:30 p.m., defendant entered Graf's with another man, James Linsley. Defendant had been in Graf's several times before and had introduced himself to Grasty as "Jim Smith." Gwinn entered Graf's around 7:30 or 8 p.m. Gwinn talked and played pool with defendant and Linsley for several hours. Later, Grasty saw defendant and Gwinn kiss. About 1:30 a.m., just before Grasty closed the tavern, she saw defendant, Gwinn, and Linsley leave together. When Grasty herself left the tavern directly after them, they were gone, but Gwinn's car was still in the parking lot. Gwinn's car was later recovered from the parking lot.

Junior Hanson testified that he lives in Kewanee and is a distant cousin of defendant. Early in August of 1995, defendant arrived at Hanson's home unannounced and asked to stay through the Labor Day weekend, when he planned to go to Texas. Defendant slept on Hanson's front porch for a few days. After that, Linsley joined defendant at Hanson's house, and they erected a tent in Hanson's yard. On August 20, Hanson arrived home

around 10:30 p.m. and went to sleep. He heard nothing unusual during the night. At 6:45 a.m. on August 21, Hanson watched as defendant quickly loaded the tent into his car. Defendant told Hanson that he and Linsley would be renting a campsite at a nearby park. Defendant and Linsley left by 7 a.m. Hanson did not see defendant again until the trial.

Crecinda Harris lives across the street from Hanson. She identified defendant and Linsley as the two men who had been living in a tent in Hanson's yard in August of 1995. In the early hours of August 21, Harris was awake sewing bridesmaid dresses. Harris took a break and sat outside on her front steps at about 2 a.m. While sitting there, she heard a woman loudly cry out in a pleading voice, "No, not that. Oh, no, not that." Harris described the voice as coming from the tent in Hanson's yard. She heard nothing else. Fearful, Harris crawled back into her house and went to bed. She did not call police because she had no telephone.

At 6:30 a.m. that same morning, as Harris was leaving to drive her son to work, she saw defendant's car parked on Hanson's side terrace, where she had never seen it parked before. Harris returned home 15 minutes later and saw that defendant's car had been moved to the driveway, with its motor running. She observed defendant "hurriedly" break down his tent and place it in the car. Linsley was standing nearby. Harris went inside her house. She never saw defendant or Linsley at Hanson's house again.

Kevin Curran testified that he lives in Annawan. On August 21, he left for work at 7:05 a.m. Shortly after that, Curran saw a car with two white males inside pulling out of a gravel road in the Hennepin Canal area at a high rate of speed onto Route 78. The car did not stop as it approached Route 78, which Curran characterized as dangerous because the car could have been hit by oncom-

ing traffic. Feeling that something was amiss, Curran followed the car and wrote down its license plate number, MMJ 296. This license plate number matched the Illinois plates on defendant's car. When Curran later heard that a dead body was found in the canal, he called police. In court, Curran identified defendant as the driver of the car and Linsley as the passenger.

Alice Hanson, the daughter-in-law of Junior Hanson, also lives in Kewanee. She met defendant and Linsley through her relatives. Defendant stayed at her home once or twice, and Linsley slept there a few times. Before Gwinn's murder, defendant told Alice that he and Linsley had gone swimming in a canal near Annawan.

A vaginal swab taken during Gwinn's autopsy contained seminal material and sperm cells. Kristin Boster, a forensic scientist and expert in deoxyribonucleic acid (DNA) analysis, testified that she isolated the DNA taken from the swab and determined it to be too degraded for a restriction fragment length polymorphism (RFLP) analysis. Elizabeth Benzinger, a molecular biologist and also an expert in DNA analysis, agreed that there was insufficient DNA to perform an RFLP analysis. She explained that the DNA was degraded because the murderer had placed Gwinn's body in the canal. Benzinger therefore analyzed the DNA using the polymerase chain reaction (PCR) technique. She compared the DNA taken from the swab to samples taken from defendant, Linsley, and the victim. Benzinger concluded that Linsley could not have contributed to the vaginal swab. Benzinger could not, however, exclude defendant as the source of the semen on the swab. According to Benzinger, the percentage of the United States' population that could have contributed the DNA recovered from the swab was 2.6% of white persons and 3.6% of black persons.

A police officer for the City of Coffeyville, Kansas, testified that he pulled defendant and Linsley over on

August 21, 1995. The officer took Linsley into custody on an outstanding warrant from the State of Washington, but did not detain defendant.

A police officer for the City of Tucson, Arizona, testified that he approached defendant for questioning at 1 a.m. on August 29, 1995. Tucson authorities then held defendant in custody after discovering that he was wanted on an Illinois warrant charging him with Gwinn's murder.

James Linsley, defendant's cousin, testified for the prosecution. In August of 1995, Linsley was living at the Rescue Mission in Galesburg, Illinois, when defendant picked him up and drove him to Hanson's home in Kewanee. For the first few days, Linsley slept in defendant's car and defendant slept on Hanson's front porch. They then erected a tent in Hanson's yard. Linsley slept in the tent one night, but then slept at Hanson's son's house.

On August 20, at about 5 p.m., Linsley and defendant went to Graf's and played pool. Around 9 p.m., Laurie Gwinn, whom Linsley did not know, came into Graf's. Gwinn played pool with defendant and Linsley until 11 p.m. Gwinn and defendant sat together and talked from 11 p.m. until closing time. While at Graf's, Linsley drank a couple of beers which defendant purchased for him.

The bartender announced last call around 1:15 a.m., and Linsley walked out to defendant's car. Defendant and Gwinn then walked out to the car. Defendant told Gwinn that he would drive her home because she was too drunk to drive herself. Gwinn accepted. Once in the car, defendant told Gwinn that he would drop Linsley off at Hanson's house first.

They arrived at Hanson's house at about 1:45 a.m. Gwinn, defendant, and Linsley exited the car and walked toward the tent in Hanson's yard. Linsley noticed that Gwinn was wearing some expensive jewelry while at Graf's and when she exited defendant's car. Gwinn and

defendant started arguing because Gwinn wanted to go home. Gwinn appeared frightened. Defendant then grabbed her arm, hit her in the face, and squeezed her throat with his hand while Gwinn gagged and coughed. With one hand still on Gwinn's throat, defendant grabbed her hair with his other hand and pulled her into the tent.

Linsley stated that he was "too scared" to help Gwinn. He just walked back to the car, parked about 15 feet away, and drank some beer. Defendant lit a candle in the tent, which allowed Linsley to see shadows of what was happening. Linsley saw the shadow of defendant as he removed Gwinn's pants. He saw defendant's shadow move up and down on top of Gwinn. Defendant appeared to be having sexual intercourse with Gwinn. Gwinn's body did not move. After a while, defendant stopped. He later started up again. Gwinn's body never moved. At some point Linsley had heard Gwinn cry out, "No, not that. Oh, no, not that."

A few hours later defendant exited the tent and drove his car to Hanson's side yard. Defendant carried Gwinn's clothed body from the tent and placed it in the car's front seat. Defendant told Linsley to get into the car's back seat, and Linsley complied. Defendant drove to the canal near Annawan, where he and Linsley had gone swimming the week before. They arrived at the canal around 6 a.m. Defendant removed Gwinn's body from the car, placed it on the cement boat dock, and removed Gwinn's clothing. Defendant and Linsley threw Gwinn's body in the canal and returned to Hanson's house. Defendant was laughing and smiling.

At Hanson's house, defendant directed Linsley to buy coffee. Linsley walked to a nearby convenience store, purchased two cups of coffee, and returned. Linsley overheard defendant tell Hanson that they were going camping. Defendant quickly broke down the tent and loaded it into the car. Defendant and Linsley then drove back to

the canal area. There, defendant drove down a gravel road, but stopped when he noticed a car behind them. Defendant became angry, turned around, and sped out onto the highway.

Defendant stopped at some pawn shops in Davenport, Iowa. He then showed Linsley a wad of money. Defendant laughed and said, "Look, where did I get all this money?" The pair also stopped at rest areas, where defendant threw items into garbage cans.

That night police stopped them in Kansas. The police arrested Linsley on a felony charge pending against him in the State of Washington. Linsley gave his first statement to two officers on August 26, 1995. Linsley gave his second statement to the same officers the next day. Linsley acknowledged that in his first statement he omitted telling police that he saw defendant hit Gwinn and have sex with her.

In his testimony, Linsley acknowledged that he had mental problems, suffered from hallucinations, and had been committed to mental hospitals throughout his life. At times, he had difficulty remembering past events. Linsley also has epilepsy, for which he takes a prescription drug, which he should not mix with alcohol. He tends to get confused if he drinks alcohol while taking his medication.

Linsley further testified that he was in custody because he, like defendant, was charged with Gwinn's murder. His attorney had advised him of his fifth amendment right against self-incrimination and that anything he said in court could be used against him. Linsley still wanted to testify. Linsley stated that he had no agreement with the Henry County State's Attorney's office regarding the charges against him. Nor did Linsley expect anything in return for his testimony. The State's Attorney had offered to recommend a sentence of 20 years' imprisonment if Linsley pled guilty to murder. Linsley, however, had rejected that offer.

On cross-examination, Linsley explained that he was arrested in Kansas because he had a felony charge pending against him in Washington. The following colloquy occurred when defense counsel asked Linsley whether he had any expectation of leniency regarding the Washington charge:

"Q. In fact, you are hoping if you do good, you do well here, you will get—

A. No.

Q. —the State's Attorney to help you out there?

A. No. I have to face those charges out there just as well as I do here."

Linsley's attorney later testified and confirmed that the Henry County State's Attorney's office had offered to recommend a prison sentence of 20 years for Linsley if he pled guilty to Gwinn's murder and testified against defendant. At the time this offer was made, Linsley had already given his statements to police. Linsley rejected the offer and testified against defendant without an agreement. The attorney further explained that the offer had never been withdrawn, so Linsley could choose to accept it after defendant's trial if it was still available.

William Joe Tennison, a convicted forgerer, burglar, and domestic batterer, shared a cell with defendant for four days while defendant was awaiting trial. Tennison testified regarding statements defendant made to him in jail. According to Tennison, defendant said, in reference to Linsley, "I wish I killed him too." When Tennison remarked to defendant that Tennison "would have got rid of all [the] witnesses," defendant responded, "that's the reason I went back out there the second time." Defendant also stated that he planned to "get rid" of Linsley in Arizona, but was foiled when police arrested Linsley in Kansas. Lastly, when Tennison asked defendant "what was it like to have sex with a dead woman," defendant laughingly replied that "it was a dead fuck."

Tennison denied expecting anything from the State's

Attorney's office in exchange for his testimony. He admitted, however, that there was a case pending in juvenile court involving his wife's children. Regarding that case, Tennison acknowledged that he had caused problems for his wife and her children with the Department of Children and Family Services, and that he wanted to reconcile with his wife. The first person to whom Tennison attempted to communicate defendant's statements was the assistant State's Attorney who accepted Tennison's guilty plea to domestic battery. She referred him to the State's Attorney of Henry County.

After the State rested its case, defendant presented the testimony of more than 20 witnesses. Several of these witnesses related knowledge of Gwinn's recent divorce and her whereabouts during the weekend before her murder. The witnesses denied that there was any animosity between Gwinn and her former husband. The witnesses also denied suspecting her former husband in Gwinn's death. On Sunday, August 20, around 6 p.m., Gwinn played pool with friends at Esser's, another local tavern, before proceeding to Graf's. Gwinn was wearing her jewelry that evening, as always.

Junior Hanson testified for the defense that the dogs in his yard would bark if someone they did not know entered the yard. Hanson would have expected the dogs to bark if Gwinn came into his yard. He heard no barking on that night, however. On cross-examination, Hanson noted that his dogs do not bark at people whom they know. His dogs were familiar with defendant and Linsley because they had been staying at the house.

Dr. Robert Kirschner, a forensic pathologist, testified that he reviewed the autopsy reports and photographs of Gwinn. He agreed that Gwinn's death was the result of a violent act properly classified as a homicide. Kirschner, however, found insufficient evidence to support the conclusion that Gwinn had been strangled. He concluded

that asphyxiation was the cause of Gwinn's death. Asphyxiation can result from both suffocation and drowning, in addition to strangulation.

A Kewanee detective testified that defendant's car was messy and cluttered inside when he saw it in Tucson. The Federal Bureau of Investigation (FBI) "dusted" the car for fingerprints, removed and bagged all items found in the car, pulled the seats apart, and vacuumed the interior. An FBI agent testified that he examined all the items that had been removed from defendant's car. He found no hair that matched Gwinn's hair. He explained, however, that the absence of Gwinn's hair in the vehicle did not prove that Gwinn had not been there. An FBI fingerprint specialist stated that he examined four latent fingerprints of value from among the 51 lifts taken from defendant's car and the items therein. He identified defendant's and Linsley's prints on items in the car and on the outside fender. He matched all prints that were suitable for comparison, although he was not given Gwinn's prints to check against the latent prints. The specialist explained that the absence of a person's fingerprints within a car does not mean that the person was not inside the car. He also explained that a dead person is not likely to leave fingerprints.

Defendant testified in his own behalf and denied any knowledge of, or involvement in, Gwinn's death. In August of 1995, defendant was staying at Hanson's house with Linsley. Defendant and Linsley were at Graf's on August 20. There they met Gwinn, with whom they played pool. At about 1 or 1:30 a.m., as defendant was leaving the tavern, he asked the bartender whether any other taverns were open. The bartender replied that Zodiac's was a late-night establishment, but she did not know how late it stayed open on Sunday nights. Defendant then asked Gwinn if she wanted to meet him at Graf's the following Friday night. She agreed. Defen-

dant, Gwinn, and Linsley then walked outside. Linsley said he was tired and went to the car. Gwinn told defendant that she would see him the next Friday, and they said goodbye to each other. At that moment, an older car drove by and honked its horn. Gwinn waved at the car, which pulled into a lot across the street. Defendant went to his car, and he and Linsley returned to Hanson's house. Defendant asserted that he did not know what happened to Gwinn after he drove away from the tavern.

According to defendant, after they arrived at Hanson's house, Linsley slept in the tent and defendant slept in the car. Defendant did not hear anything unusual during the night. The next day, defendant awoke at daybreak, which was his custom. He and Linsley broke down the tent and packed it into the car. Defendant sent Linsley for coffee and to get directions to Linsley's sister's house. Defendant decided to leave that morning even though he had made plans to meet Gwinn the next Friday.

Defendant stated that he and Linsley drove toward Interstate 80. When defendant missed the on-ramp for Interstate 80, he turned his car around on a gravel road. Defendant noticed a driver of another vehicle look at him as he did this. Defendant then proceeded to Rock Island, Illinois, where Linsley unsuccessfully attempted to reach his sister. They then drove west to Kansas, and Linsley was arrested. Following Linsley's arrest, defendant went to Las Vegas, Nevada, for a few days, and then to Tucson. Police arrested defendant in Tucson.

After defendant's arraignment, defendant's attorney told him not to speak with anyone about his case. Defendant heeded his attorney's advice. Defendant did not speak with anyone about his case, including cellmate Tennison, whom defendant caught reading his legal papers upon returning from a shower.

In an effort to bolster his claim that he never spoke with Tennison about his case, defendant presented the

testimony of several jailers and jail inmates. The jailers testified that, to their knowledge, defendant did not speak with the other inmates much. The jail inmates testified that they never heard defendant speak about his case and that, when asked by other inmates about his case, defendant would not respond.

Defense counsel also questioned the jailers about defendant's behavior in jail. The jailers acknowledged that defendant followed commands, was polite in his interactions with staff, and was not known to cause harm to other inmates or staff members.

Finally, in a further effort to bolster defendant's claim that he never spoke with Tennison about his case, defendant called Gilbert Cady, sheriff of Henry County, to the stand. Cady testified that defendant was in custody at the Henry County jail while awaiting his trial. Defendant had no place in his cell to secure his legal papers. His cellmates therefore had access to those papers, particularly when defendant left the cell to take a shower. In March or April of 1996, defendant's attorney asked Cady not to place anyone else in defendant's cell. Cady could not accommodate this request because of the number of prisoners in the jail.

The defense rested. The jury retired to deliberate after hearing closing arguments and receiving its instructions. As earlier noted, the jury returned verdicts finding defendant guilty of all the charges.

Defendant's bifurcated capital sentencing hearing commenced. At the first phase, the jury found defendant eligible for the death penalty. Defendant then waived the jury for the second, aggravation-mitigation phase.

In aggravation, the State initially presented brief victim impact testimony from Gwinn's father, sister, and mother. The State also offered additional testimony from Linsley. Linsley stated that after defendant picked him up in Galesburg, they went to several bars where defen-

dant became "pretty drunk." While drunk, defendant told Linsley that he had killed several women around Peoria, Illinois. Defendant smiled as he said this. Linsley did not know whether defendant was serious or joking. Linsley claimed that he informed the police in Kansas about this statement, but acknowledged that the statement did not appear in the police's written records.

The State presented Peoria Detective Terry Pyatt as its last witness in aggravation. Over defendant's continuing objection, Pyatt testified regarding his conversations with several Peoria-area prostitutes. Five prostitutes stated that defendant had physically assaulted them. A sixth prostitute told Pyatt that, while in defendant's car, she saw handcuffs and a photograph of a missing Peoria woman, who appeared dead.

Pyatt further related conversations that he had with defendant's former girlfriend, Connie Waldren. Waldren told them that, among defendant's belongings, she found two Polaroid snapshots of what appeared to be nude, deceased women, bound about their throats, arms, body, and legs. Waldren thought that the women had orange rope around their throats and that the photos had been taken inside of defendant's car. Defendant took the photos away from Waldren.

In mitigation, defendant's mother, Dorothy Davis, testified that defendant, her only child, was born in Gillette, Arkansas, in 1955. She described defendant as a good boy, who received grades of Bs and Cs in school. While in high school, defendant worked as a janitor. Defendant dropped out of high school in the tenth grade. He then lived at home with his mother and worked at a laundromat and general store.

Mrs. Davis related that defendant had eight children by four different women throughout his lifetime. He married his first wife at age 21, and they had four children together. The family often visited with Mrs. Davis, and

she thought that defendant was loving toward his children. After a divorce in 1980, defendant returned home to live with his mother. Defendant then married his second wife, with whom he had two children. Mrs. Davis thought that defendant treated these children well. For a time, seven children were living with defendant, including defendant's six children and his second wife's child from a previous marriage.

After defendant's second divorce, he moved in with his mother, who was then living in Illinois. Defendant had a seventh child with a third woman. In late 1994, defendant entered into a relationship with Connie Waldren, and they had a child together. When Waldren became pregnant, her mother would no longer let her stay with her, so Waldren moved in with Mrs. Davis and defendant. Later, when Waldren struck one of her children in the eye, the Department of Children and Family Services removed Waldren's three children from her care. Waldren signed papers giving up her parental rights to her children. Defendant, however, never gave up his rights to his and Waldren's child.

On cross-examination, Mrs. Davis explained that defendant would support his children "while he was with them." She may have told a detective that defendant does not pay rent or help with chores. Mrs. Davis acknowledged that she once threatened to cut defendant with a paring knife if he did not leave her alone; that defendant charged $3,000 to her credit card, which he never paid; that defendant would stay out until 5 or 6 a.m.; and that defendant could be lazy.

Ramon Streitmatter, defendant's uncle, testified that there was nothing unusual about defendant when he was a boy. Streitmatter thought that defendant got along fine with his mother, former wives, and children. He never saw defendant act violently. As an adult, defendant worked as a laborer and janitor, but not often. Defendant

had no disability that prevented him from working, but Streitmatter thought that defendant would have difficulty finding employment due to his lack of education and skills. On cross-examination, Streitmatter stated that defendant's children received state aid.

Donald Fulton, a jailer, was recalled to testify at sentencing. During the seven months that defendant was incarcerated at the Henry County jail, Fulton never saw him violate any rules or engage in any conduct that would be cause for discipline. In Fulton's opinion, defendant had "adjusted well" to incarceration.

After considering the evidence, the circuit court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced defendant to death for the murder of Gwinn. The circuit court also imposed prison terms for aggravated criminal sexual assault, aggravated kidnapping, robbery, and concealment of a homicidal death.

Additional facts are presented in the analysis portion of the opinion where necessary.

## ANALYSIS

### I. Trial Issues

#### A. *Cross-Examination of James Linsley*

Defendant initially contends that he was deprived of his constitutional right to confront and cross-examine State witness James Linsley by the circuit court's refusal to allow him to elicit the nature or the severity of the criminal charge pending against Linsley in the State of Washington. Defendant alternatively argues that, to the extent that his defense counsel acquiesced in the circuit court's ruling, defendant was deprived of the effective assistance of counsel.

The record discloses that, before trial, the State filed a motion *in limine* to bar defendant from cross-examining Linsley about the felony charge pending against Linsley

in Washington. The charge was for rape of a child in the first degree. The State asserted that the pending charge could not be properly used for impeachment because there had been no conviction. The State argued further that, since there was no evidence that Linsley had been offered anything or had any expectation of leniency regarding the charge as a result of his testimony in this case, the State's case would be unduly prejudiced by allowing defendant to inquire into the matter. Defense counsel countered that defendant had the right to cross-examine Linsley about whether he was testifying against defendant with an expectation of leniency regarding the pending charge. Defense counsel added: "I don't even care [if] we necessarily explain to the jury exactly what the charge is. If there is prejudice attached to that, *** I am willing to work with the court and the State in terms of how the question is phrased."

The circuit court granted the State's motion in part. The court first ruled that the pending charge was not proper for general impeachment purposes because there was no conviction. The court then explained that another aspect of impeachment remained to be considered: *i.e.*, whether defendant was entitled to use the pending charge to impeach Linsley by showing that he had a motive to testify falsely. The circuit court ruled that defendant must be permitted to cross-examine Linsley about any expectation of leniency that he had regarding the pending charge. The court, however, forbade defendant from mentioning the name or nature of the pending charge, other than stating that it was a "felony."

In accordance with the circuit court's ruling, defense counsel limited his cross-examination of Linsley to whether Linsley expected any lenient treatment on his pending "felony" charge in Washington in exchange for his testimony in this case. Linsley denied having any expectation of leniency.

Defendant now contends that the circuit court's ruling precluding him from mentioning the name or nature of the Washington charge pending against Linsley, other than stating that it was a "felony," deprived him of his constitutional right to confront and cross-examine Linsley. Defendant asserts that this ruling prevented him from adequately informing the jury of the extent of Linsley's motivation to offer false testimony, because defendant was not allowed to elicit the nature or the severity of the charge Linsley faced. According to defendant, Linsley was the State's key witness, and the jury likely would have acquitted defendant had they disbelieved Linsley's testimony.

A criminal defendant has a fundamental constitutional right to confront the witnesses against him and this includes the right to conduct a reasonable cross-examination. See *Olden v. Kentucky*, 488 U.S. 227, 231, 102 L. Ed. 2d 513, 519, 109 S. Ct. 480, 482-83 (1988); *People v. Triplett*, 108 Ill. 2d 463, 474 (1985). Accordingly, a defendant has the right to inquire into a witness' bias, interest or motive to testify falsely. See *Davis v. Alaska*, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110 (1974); *Triplett*, 108 Ill. 2d at 475. Evidence that a witness has been arrested or charged with a crime is a proper subject for cross-examination where it would reasonably tend to show that the witness' testimony might be influenced by bias, interest or motive to testify falsely. See *Triplett*, 108 Ill. 2d at 475. A defendant need not show that a promise of leniency has in fact been made to the witness, or that an expectation of special favor exists in the mind of the witness; rather, the evidence used need only give rise to the inference that the witness has something to gain or lose by testifying. See *Triplett*, 108 Ill. 2d at 475-76. A circuit court "has no discretion to deny a defendant this right, but only to preclude repetitive or unduly harassing interrogation." *People v. Ramey*, 152 Ill. 2d 41, 67 (1992).

The improper denial of a defendant's constitutional right to cross-examination does not always mandate reversal, but may be found to be harmless error. See *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 89 L. Ed. 2d 674, 686, 106 S. Ct. 1431, 1438 (1986); *People v. Johnson*, 116 Ill. 2d 13, 28-29 (1987); see also *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967).

> "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684, 89 L. Ed. 2d at 686-87, 106 S. Ct. at 1438.

See *People v. Young*, 128 Ill. 2d 1, 43-44 (1989).

In the present case, we conclude that, even if the circuit court improperly restricted defendant's cross-examination of Linsley, that error was harmless beyond a reasonable doubt. The evidence of defendant's guilt was overwhelming even when considered apart from Linsley's testimony, and the restriction imposed on defendant's cross-examination of Linsley was not significant.

Evidence other than Linsley's testimony showed the following. Defendant and Linsley were seen leaving Graf's tavern with the victim Laurie Gwinn at about 1:30 a.m. on August 21, 1995. Gwinn did not report to work later that same morning. Gwinn's car never left Graf's parking lot and was later recovered therefrom. At about 2 a.m. that day, Crecinda Harris, who lived across the street from Junior Hanson's house where defendant was staying, heard a woman loudly cry out in a pleading

voice, "No, not that. Oh, no, not that." She described the voice as coming from defendant's tent in Hanson's yard. Harris was so frightened as a result that she crawled back into her home. Around 6:30 a.m. that day, defendant was observed as he quickly packed his tent into his car. Defendant and Linsley then left Hanson's house and never returned. Defendant did not stay through the Labor Day weekend, although he had earlier informed Hanson that he would. Nor did defendant go camping at a nearby campsite, despite telling Hanson of his plan to do so.

Further, at approximately 7:05 a.m., Kevin Curran witnessed defendant's car leave the Hennepin Canal area at a high rate of speed. Suspicious, Curran followed the car and wrote down its license plate number, MMJ 296. This license plate number matched the plates on defendant's car. Curran identified defendant as the driver of the car and Linsley as the passenger. The pair then fled the Kewanee area. The next day, Gwinn's body was recovered from the Hennepin Canal. The jewelry that Gwinn always wore was missing. An autopsy revealed that she had been raped and murdered. In addition, before Gwinn disappeared, defendant told Alice Hanson that he and Linsley had gone swimming in that canal, which was evidence of his familiarity with the canal.

Finally, William Joe Tennison, one of defendant's cellmates, testified that defendant made several incriminating statements to him. DNA experts testified regarding seminal material taken from Gwinn's vagina during the autopsy and the tests performed thereon. As a result of those tests, Linsley was excluded as the donor of that seminal material. Defendant, however, could not be excluded as the source. All the foregoing facts, when considered together, provide overwhelming evidence of defendant's guilt. Thus, the evidence of defendant's guilt is overwhelming, even when considered without Linsley's eyewitness testimony to the crimes.

We note, furthermore, that defendant was permitted a full cross-examination of Linsley in all other respects. The jury was advised of a wealth of information with which to make an informed decision about Linsley's motivation for offering false testimony. The jurors were informed that Linsley was in custody because he, like defendant, was charged with Gwinn's murder. The jurors were also informed that the Henry County State's Attorney had offered to Linsley to recommend a sentence of 20 years' imprisonment if Linsley pled guilty to the murder and testified against defendant. Linsley rejected that offer. Finally, the jurors were informed that Linsley was arrested in Kansas and that he had a felony charge pending against him in Washington. Regarding the Washington charge, defendant cross-examined Linsley about whether he had any expectation of leniency, which Linsley denied. The one restriction placed on defendant's cross-examination of Linsley by the circuit court was minor in the context of this case. Indeed, upon our review of the entire record, we are certain that defendant would have been adjudged guilty of the same crimes had the circuit court permitted him to mention the name or nature of the charge pending against Linsley in Washington. We therefore conclude that any error in this regard was harmless beyond a reasonable doubt.

Given our resolution of this issue, we need not address defendant's alternative argument that his counsel was ineffective for acquiescing in the limitation placed on his cross-examination of Linsley.

### B. *Ineffective Assistance of Counsel*

Defendant next alleges ineffective assistance of counsel in his attorney's failure to rebut certain testimony of Sheriff Gilbert Cady.

The record shows that defendant called Cady to testify at trial. Cady testified that, around April of 1996, defendant's attorney asked him not to place anyone else

in defendant's cell. Cady did not recall defense counsel stating to him that the reason for this request was because there had been a problem with other inmates reading defendant's legal papers and then making accusations against him in an effort to secure favorable treatment. Rather, under the State's cross-examination, Cady recalled that defense counsel made this request "because he was afraid that [defendant] would talk to the other inmates." Defense counsel objected to this testimony, remarking: "How could he respond [to] what's in my mind, it forces me to testify in this case now." The circuit court sustained defense counsel's objection, and the jury was instructed not to consider evidence to which objections were sustained.

According to defendant, Cady's testimony severely undermined the defense case because it enhanced the credibility of State witness William Joe Tennison, who testified that defendant made incriminating statements to him while in jail. Defendant asserts that Cady's testimony gave jurors the impression that even his own lawyer thought that he would speak to other inmates about his case. Defendant contends that his counsel was ineffective for failing to repair this damage. He asserts that his counsel could have impeached Cady with Cady's prior inconsistent statement or could have testified to counsel's own recollection of their conversation or both.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) his defense counsel's performance was deficient and (2) there is a reasonable probability that, but for defense counsel's deficient performance, the outcome of the proceeding would have been different. See *Strickland v. Washington*, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). A court need not consider the deficiency prong of this test where the defendant fails to

meet the prejudice prong. See *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant here has failed to show the requisite prejudice. Cady's remark that defense counsel was afraid that defendant would talk to the other inmates about his case was but a trifle in the evidence presented against defendant at trial. As set forth in detail above, the State introduced overwhelming evidence of defendant's guilt, in addition to Linsley's eyewitness testimony. Given the overwhelming evidence, we cannot conclude that the result of defendant's trial would have been different, but for his counsel's failure to contradict Cady's remark that counsel was afraid that defendant would talk to the other inmates. Furthermore, the circuit court sustained defense counsel's objection to this remark by Cady and instructed the jury to disregard it altogether. The jury is presumed to have followed its instructions. See *People v. Speight*, 153 Ill. 2d 365, 373 (1992). We therefore reject this claim of ineffective assistance of counsel.

## II. Sentencing Issues

### A. *Improper Refusal to Consider Mitigating Evidence*

Defendant contends that, at the second phase of his death penalty hearing, the circuit judge improperly refused to consider mitigating evidence of defendant's positive adjustment to incarceration. This evidence consisted of testimony from jailers to the effect that, while defendant was incarcerated in jail awaiting trial, he followed commands, was polite in his interactions with staff members, and never caused any harm to staff members or other inmates. Although defendant presented this testimony during the trial phase, he specifically relied on it during sentencing. One of the jailers, Donald Fulton, was recalled to testify at the sentencing hearing. Fulton stated that he had never known defendant to violate any rules or engage in any conduct that

was reason for discipline. In Fulton's opinion, defendant had "adjusted well" to incarceration. The State presented no evidence in rebuttal. In closing argument at sentencing, defense counsel stressed that the jailers' testimony showed that defendant had adjusted well to institutional life and is not a threat to others while imprisoned. Counsel relied heavily upon this mitigating evidence in requesting that defendant be sentenced, not to death, but to a term of imprisonment.

In imposing the death sentence, the circuit judge stated:

"I've heard as far as mitigating factors here some discussion about the rehabilitative potential of Mr. Davis. In two areas, one is an adjustment to jail life. I have difficulty putting rehabilitation in the context of the adjustment of jail life. Rehabilitation is not living in jail. Rehabilitation is living on the streets with ordinary people and not breaking any laws. *So I don't care how great a prisoner is*, the real test and issue is what's going to happen upon release." (Emphasis added.)

Defendant argues that the judge's comments show that he improperly ignored the mitigating evidence presented on defendant's behalf. According to defendant, this action by the sentencing judge violated his constitutional rights to a fair and reliable death penalty hearing. See U.S. Const., amends. VIII, XIV.

The State first counters that defendant waived this claim because he neither objected to the judge's comments at sentencing nor raised the issue in his post-trial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Application of the waiver rule, however, is less rigid where the basis for the objection is the circuit judge's conduct. See *People v. Williams*, 173 Ill. 2d 48, 85 (1996). Because the basis for defendant's claim is the circuit judge's alleged refusal to consider certain mitigating evidence at defendant's death penalty hearing, which concerns the fundamental fairness of that proceeding, we review the claim for error. See *People v. Johnson*, 146 Ill.

2d 109, 146-47 (1991); *People v. Fields*, 135 Ill. 2d 18, 56 (1990); *People v. Odle*, 128 Ill. 2d 111, 134 (1988).

Since the mid-1970s, the United States Supreme Court has issued a series of decisions explaining what the eighth and fourteenth amendments to the United States Constitution require with regard to the consideration of mitigating factors in capital cases. See *Johnson v. Texas*, 509 U.S. 350, 359-62, 125 L. Ed. 2d 290, 300-02, 113 S. Ct. 2658, 2664-66 (1993) (summarizing the case law). One rule that emerged and is now well established is that the State cannot place any limitation on the admission of relevant and reliable evidence offered in mitigation at a death penalty hearing. See *Hitchcock v. Dugger*, 481 U.S. 393, 398-99, 95 L. Ed. 2d 347, 353, 107 S. Ct. 1821, 1824 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 4, 90 L. Ed. 2d 1, 6, 106 S. Ct. 1669, 1670-71 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65 (1978) (plurality opinion). As a corollary principle, the Court has also held that the sentencing authority, whether judge or jury, may not refuse to consider such mitigating evidence as a matter of law. See *Hitchcock*, 481 U.S. at 394, 398-99, 95 L. Ed. 2d at 350, 353, 107 S. Ct. at 1822, 1824; *Eddings*, 455 U.S. at 113-14, 71 L. Ed. 2d at 10-11, 102 S. Ct. at 876-77. The sentencer and the reviewing court "may determine the weight to be given relevant mitigating evidence," but "may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114-15, 71 L. Ed. 2d at 11, 102 S. Ct. at 877.

As an initial matter, we address whether the evidence offered by defendant was relevant and mitigating. Defendant urges that *Skipper v. South Carolina*, 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986), controls this inquiry. In *Skipper*, the petitioner was convicted of capital mur-

der and rape. The State of South Carolina sought the death penalty. At the petitioner's capital sentencing hearing, the trial court refused to admit into evidence the testimony of two jailers and a "regular visitor" at the jail to the effect that the petitioner had "made a good adjustment" during his time spent in jail. *Skipper*, 476 U.S. at 3, 90 L. Ed. 2d at 5-6, 106 S. Ct. at 1670. The Supreme Court held that the exclusion of this evidence violated the petitioner's constitutional right to place before the capital sentencer relevant mitigating evidence. See *Skipper*, 476 U.S. at 4, 90 L. Ed. 2d at 6, 106 S. Ct. at 1671. The Court therefore ordered the petitioner's death sentence reversed and remanded for further proceedings. See *Skipper*, 476 U.S. at 9, 90 L. Ed. 2d at 9, 106 S. Ct. at 1673. In doing so, the Court left no doubt that it considered evidence of a defendant's good behavior in jail and good adjustment to prison life to be mitigating in nature and thus relevant to the sentencing determination. The Court noted that such evidence gives rise to inferences that unquestionably would be mitigating because those inferences might serve as a basis for imposing a sentence less than death. See *Skipper*, 476 U.S. at 4-5, 90 L. Ed. 2d at 7, 106 S. Ct. at 1671. The Court thus held that "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Skipper*, 476 U.S. at 7, 90 L. Ed. 2d at 8, 106 S. Ct. at 1672.

As in *Skipper*, the evidence at issue in this case concerns defendant's good behavior in jail and his positive adjustment to incarceration. We therefore agree with defendant that, pursuant to *Skipper*, this evidence must be considered relevant and mitigating. The State does not suggest otherwise. Accordingly, under the Supreme Court precedent set forth above, the sentencing authority may not refuse to consider this mitigating evidence as

a matter of law. See *Hitchcock*, 481 U.S. at 394, 398-99, 95 L. Ed. 2d at 350, 353, 107 S. Ct. at 1822, 1824; *Eddings*, 455 U.S. at 113-14, 71 L. Ed. 2d at 10-11, 102 S. Ct. at 876-77.

The dispositive inquiry here thus becomes whether the sentencing judge refused to consider this mitigating evidence as a matter of law, as defendant claims. The State argues that the sentencing judge's comments do not mean that the judge would not, under any circumstance, consider evidence of good jail behavior as mitigating a death sentence. Rather, the State contends, the judge's comments show only that he "was concerned not with Defendant's ability to live peaceably in jail, but with the risk that defendant would pose to society upon his release if he was given a term of years." By admitting that the judge was not concerned with defendant's ability to live peaceably in jail, the State in effect concedes that the judge refused to consider the proffered mitigating evidence of defendant's good jail behavior and his positive adjustment to incarceration. This was not permissible.

As noted, the Supreme Court has firmly established that while a capital sentencer "may determine the weight to be given relevant mitigating evidence," the sentencer "may not give it no weight by excluding such evidence" from its consideration. *Eddings*, 455 U.S. at 114-15, 71 L. Ed. 2d at 11, 102 S. Ct. at 877. The sentencing judge's comments here reveal that he did not determine the weight to be given the mitigating evidence of defendant's good jail behavior and his positive adjustment to incarceration, but rather refused to consider this evidence at all. The judge first stated: "I've heard as far as mitigating factors here some discussion about the rehabilitative potential of Mr. Davis. In two areas, one is an adjustment to jail life. I have difficulty putting rehabilitation in the context of the adjustment of jail life. Rehabilitation is

not living in jail. Rehabilitation is living on the streets with ordinary people and not breaking any laws." By these comments, the judge was undoubtedly referring to defendant's proffered mitigating evidence of his good jail behavior and his positive adjustment to incarceration. The judge then continued: *"So I don't care how great a prisoner is,* the real test and issue is what's going to happen upon release." (Emphasis added.) With this latter comment, the judge expressed the categorical belief that such evidence is never relevant to a capital sentencing decision. The judge's comments thus demonstrate that he did not consider defendant's proffered mitigating evidence of his good jail behavior and his positive adjustment to incarceration, based upon the judge's mistaken belief that such evidence is not mitigating. Consequently, we must hold that the sentencing judge's refusal to consider this mitigating evidence in determining whether to impose capital punishment upon defendant deprived him of the individualized consideration required by the eighth and fourteenth amendments.

This case is analogous to *Eddings v. Oklahoma,* 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). In *Eddings,* the sentencing judge, in sentencing the defendant to death, remarked: "Nor can the Court in following the law, in my opinion, consider the fact of this young man's violent background." The Supreme Court determined that the judge's remark evidenced his refusal to consider in mitigation the circumstances of the defendant's unhappy upbringing and his emotional disturbance. The Court held that the judge's refusal to consider this proper mitigating evidence as a matter of law violated the defendant's constitutional rights to an individualized death penalty determination. The Court therefore reversed his death sentence and remanded for further proceedings. See *Eddings,* 455 U.S. at 117, 71 L. Ed. 2d at 12, 102 S. Ct. at 878.

Here, as in *Eddings*, "it is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact, rather he found that *as a matter of law* he was unable even to consider the evidence." (Emphasis in original.) *Eddings*, 455 U.S. at 113, 71 L. Ed. 2d at 10, 102 S. Ct. at 876. In *Eddings*, the trial judge was laboring under the mistaken belief that he could not consider evidence of a difficult childhood and emotional disturbance as mitigating. Similarly, in this case, the sentencing judge proceeded under the mistaken belief that he could not consider evidence of a defendant's good jail behavior and positive adjustment to incarceration as mitigating.

The dissent, however, asserts that our application of the foregoing Supreme Court precedent to this case is legally flawed. According to the dissent, *Eddings* is distinguishable from this case because *Eddings* requires reversal of a death sentence only when the sentencer "applies an erroneous legal standard in determining whether the sentencer may consider certain mitigating evidence." *Eddings* is not distinguishable on this basis. As we explained above, that is precisely what happened in this case. Moreover, to the extent that the dissent suggests that *Eddings* applies only where the sentencer has been precluded from hearing certain mitigating evidence, the dissent is not accurate. In *Eddings*, as in this case, the mitigating evidence at issue was fully admitted at the sentencing hearing and was thus heard by the sentencing judge. Yet the sentencing judge in *Eddings*, like the sentencing judge here, refused to consider that mitigating evidence in determining whether to impose capital punishment. Therefore, the dissent's attempt to distinguish *Eddings* fails.

The dissent also claims, on a related note, that the other Supreme Court cases that we cite "stand simply for the proposition that the sentencer in a capital case

must be allowed to consider all relevant mitigating evidence." Although these cases do stand for the principle that the State cannot place any limitation on the admission of relevant and reliable evidence offered in mitigation at a death penalty hearing, the Supreme Court has explicitly stated that they stand for an additional principle as well, *i.e.*, that a capital sentencer may not refuse to consider such mitigating evidence as a matter of law. *Hitchcock*, 481 U.S. at 394, 95 L. Ed. 2d at 350, 107 S. Ct. at 1822 ("We have held that in capital cases, ' "the sentencer" ' may not refuse to consider *** any relevant mitigating evidence"); *Skipper*, 476 U.S. at 4, 90 L. Ed. 2d at 6, 106 S. Ct. at 1671 ("Equally clear is the corollary rule that the sentencer may not refuse to consider" mitigating evidence); see also *Eddings*, 455 U.S. at 113-14, 71 L. Ed. 2d at 10-11, 102 S. Ct. at 876-77 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence"). Consequently, we reject the dissent's limited interpretation of these cases.

The dissent next argues that our application of the foregoing Supreme Court precedent to this case is factually flawed. According to the dissent, the sentencing judge here did consider the mitigating evidence at issue. The dissent, however, makes this claim in a conclusive manner. The dissent cites no evidence from the record in support of its claim; nor could it, because there is none. Rather, the sentencing judge's comments, which we fully set forth above, plainly show that the sentencing judge refused to consider the mitigating evidence at issue. Therefore, the opinion is factually correct.

In cases in which a capital sentencer has not considered mitigation evidence in violation of the above principles, the Supreme Court has in effect vacated the defendant's death sentence as invalid. See *Hitchcock*, 481

U.S. at 399, 95 L. Ed. 2d at 353, 107 S. Ct. at 1824-25; *Eddings*, 455 U.S. at 117, 71 L. Ed. 2d at 12, 102 S. Ct. at 878; *Skipper*, 476 U.S. at 8-9, 90 L. Ed. 2d at 9, 106 S. Ct. at 1673. The Court in *Hitchcock v. Dugger*, 481 U.S. 393, 399, 95 L. Ed. 2d 347, 353, 107 S. Ct. 1821, 1824 (1987), stated that, in the absence of a showing by the State that the error was harmless or that it had no effect on the sentencing judge or jury, the death sentence cannot stand. In the present case, the State fails to make the showing required for an affirmance of defendant's death sentence. The record discloses that the evidence that the sentencing judge refused to consider was a significant part of the defense case in mitigation. The jailers' testimony showed that defendant behaved well in jail and had made a positive adjustment to incarceration. The State presented no evidence to contradict the jailers' testimony. In closing argument, the defense relied heavily on this mitigation evidence in requesting a sentence of less than death for defendant. Yet the sentencing judge refused to give this evidence any consideration whatsoever. The judge was under the impression that such evidence is not mitigating, despite *Skipper*'s pronouncement to the contrary. Under our death penalty statute, the sentencer must consider the mitigating factors, weigh those against the aggravating factors, and determine whether the mitigating factors are sufficient to preclude imposition of the death penalty. See *People v. Thompkins*, 121 Ill. 2d 401, 452 (1988). On the record before us, we cannot say that the judge's refusal to give any consideration to the mitigating evidence of defendant's good jail behavior and his positive adjustment to incarceration was harmless or that it had no effect on the outcome. As a result, defendant's death sentence must be vacated. See *Skipper*, 476 U.S. at 8, 90 L. Ed. 2d at 9, 106 S. Ct. at 1673 (holding that the exclusion of such evidence from the sentencing jury's consideration was "sufficiently prej-

udicial to constitute reversible error" "under any standard"); *People v. Boclair*, 129 Ill. 2d 458, 494-95 (1989) (similarly vacating a death sentence where the sentencing judge refused to consider certain mitigating evidence).

Having vacated the death sentence, we remand this cause to the circuit court for a new sentencing hearing. The State is not precluded from seeking the death penalty for defendant on remand. See *Hitchcock*, 481 U.S. at 399, 95 L. Ed. 2d at 353, 107 S. Ct. at 1824; *Skipper*, 476 U.S. at 8, 90 L. Ed. 2d at 9, 106 S. Ct. at 1673. If the State seeks capital punishment for defendant on remand, however, only the second phase of defendant's capital sentencing hearing need be conducted anew. See *People v. Turner*, 128 Ill. 2d 540, 573 (1989); *People v. Rogers*, 123 Ill. 2d 487, 523 (1988). Defendant has raised no assertion of error in this appeal regarding the jury's determination that he is eligible for the death penalty.

## B. *Aggravating Evidence*

Defendant also maintains that the circuit judge abused his discretion when he admitted certain aggravating evidence at the second phase of defendant's death penalty hearing. Defendant insists that he is entitled to a new sentencing hearing as a result. Given that we have already vacated defendant's death sentence and remanded for a new sentencing hearing, we need not address this issue in order to dispose of this appeal. We therefore express no opinion on the propriety of the circuit judge's rulings in this regard.

## C. *Constitutionality of Death Penalty Statute*

Defendant last challenges the constitutionality of the Illinois death penalty statute on three grounds. He contends that the statute is unconstitutional because it places a burden of proof on defendants to show that mitigating evidence outweighs aggravating evidence, al-

lows sentencers to weigh a vague aggravating factor, and fails to minimize the risk of arbitrarily imposed death sentences. As defendant acknowledges, this court has repeatedly rejected these claims. See, *e.g.*, *People v. Taylor*, 166 Ill. 2d 414, 439-40 (1995) (and cases cited therein); *People v. Rissley*, 165 Ill. 2d 364, 407-08 (1995) (and cases cited therein); *People v. Edgeston*, 157 Ill. 2d 201, 247 (1993) (and cases cited therein). Defendant offers no reason why we should reconsider our prior decisions. Therefore, we adhere to those decisions and once again reject these claims.

As a final matter, we are compelled to address a statement made in Justice Harrison's partial concurrence and partial dissent. Justice Harrison cites to this court's majority opinion in *People v. Bull*, 185 Ill. 2d 179 (1998), and asserts that in reaching that decision it was an "undisputed fact" that Illinois' capital sentencing scheme will "inevitably lead to the execution of innocent persons." We disagree with this statement.

### CONCLUSION

For the reasons stated, we affirm defendant's convictions, but vacate his death sentence. This cause is remanded to the circuit court for further sentencing proceedings consistent with this opinion.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded.*

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that we should affirm defendant's convictions, vacate his death sentence, and remand this cause to the circuit court for resentencing. Contrary to the majority, however, I do not believe that the State should be permitted to seek the death penalty on remand. For the reasons set forth in my dissent in *People v. Bull*, 185 Ill. 2d 179

(1998), Illinois' present death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2) and is therefore unenforceable.

In reaching this conclusion, I am fully aware that my six colleagues have voted unanimously to uphold this state's capital sentencing scheme, notwithstanding the undisputed fact that it will inevitably lead to the execution of innocent persons. See *People v. Bull*, 185 Ill. 2d at 215-18; *People v. Brown*, 185 Ill. 2d 229, 260-61 (1998). If the majority's view involved nothing more than a dispute over a legal point, *e.g.*, the construction of a statute, I would normally feel constrained to adhere to its position no matter how misguided I felt it to be. Once the court has ruled on a question of law and its members have had the chance to voice their disagreement, the majority's ruling becomes the law of the state and is binding in all pending and future cases. No further dissents are appropriate. *People v. Kidd*, 175 Ill. 2d 1, 59 (1996) (Harrison, J., dissenting).

The situation here, however, is qualitatively different. The flaw in Illinois' death penalty law goes beyond questions of statutory construction, legal interpretation, or judicial philosophy. The problem inheres in the system itself. Experience has shown that the present mechanism for handling capital offenses simply does not work in a just and reliable way. Under these circumstances, the result in every death case is suspect, and no sentence of death should be allowed to stand. For the foregoing reasons, the circuit court should be directed on remand to impose a sentence other than death.

JUSTICE HEIPLE, dissenting:

The majority holds that the death sentence imposed in this case must be reversed because the sentencing judge violated the United States Constitution by refusing

to consider evidence of defendant's good behavior during pretrial incarceration. Because this holding is both legally and factually flawed, I respectfully dissent.

The majority claims that reversal of defendant's death sentence is compelled by *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). In *Eddings*, however, the sentencing judge mistakenly believed that, as a matter of law, he was not allowed to consider a particular mitigating circumstance (in that case, the defendant's difficult and violent childhood). *Eddings*, 455 U.S. at 113, 71 L. Ed. 2d at 10, 102 S. Ct. at 876. The Supreme Court held that because the defendant was entitled to have the evidence in question considered by the sentencer, the judge's ruling that the evidence was improper necessitated resentencing. *Eddings*, 455 U.S. at 113-17, 71 L. Ed. 2d at 10-12, 102 S. Ct. at 876-78. *Eddings* thus requires reversal of a death sentence only when the trial court applies an erroneous legal standard in determining whether the sentencer may consider certain mitigating evidence. The other cases cited by the majority stand simply for the proposition that the sentencer in a capital case must be allowed to consider all relevant mitigating evidence, as a close examination of the facts of those cases will reveal. See *Hitchcock v. Dugger*, 481 U.S. 393, 95 L. Ed. 2d 347, 107 S. Ct. 1821 (1987) (reversing death sentence where trial court erroneously precluded sentencer from considering certain mitigating circumstances); *Skipper v. South Carolina*, 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986) (holding that trial court erred in precluding defendant from introducing at capital sentencing hearing evidence of his good behavior during pretrial incarceration); *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (plurality opinion) (invalidating state death penalty statute which precluded sentencer from considering all relevant mitigating circumstances).

In this case, the sentencing judge heard all relevant mitigating evidence, and was under no mistaken impressions of what evidence he could consider. Having heard all of this evidence, the judge concluded that defendant's good behavior while incarcerated did not justify imposition of a sentence other than death. The majority asserts that the judge refused to consider evidence of defendant's behavior while incarcerated. That is incorrect. The judge's specific references to and discussion of this evidence demonstrate that he did consider it. *Having considered it*, however, he determined that it was not a mitigating factor sufficient to preclude the death penalty. Reversal of defendant's death sentence thus is not compelled by *Eddings* or by any other Supreme Court case interpreting the United States Constitution.

For these reasons, I would affirm the death sentence imposed by the circuit court.

CHIEF JUSTICE FREEMAN and JUSTICE MILLER join in this dissent.